# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LIBERIAN COMMUNITY ASSOCIATION OF CONNECTICUT, LOUISE MENSAH-SIEH, on behalf of herself and her minor children B.D. and S.N., NATHANIEL SIEH, VICTOR SIEH, EMMANUEL KAMARA, ASSUNTA NIMLEY-PHILLIPS, LAURA SKRIP, RYAN BOYKO, ESTHER YALARTAI, BISHOP HARMON YALARTAI, and DR. MARY JEAN O, on behalf of themselves and those similarly situated. | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.:____ |
| GOVERNOR DANNEL MALLOY, ACTING COMMISSIONER OF PUBLIC HEALTH RAUL PINO, and FORMER COMMISSIONER OF PUBLIC HEALTH JEWEL MULLEN, | ) ) ) ) ) | |
| Defendants. | ) ) ) | February 8, 2016 |

Plaintiffs Louise Mensah-Sieh, her minor children B.D. and S.N., Nathaniel Sieh, Victor Sieh, Emmanuel Kamara, Assunta Nimley-Phillips, Laura Skrip, Ryan Boyko, Esther Yalartai, Bishop Harmon Yalartai, Dr. Mary Jean O, and the Liberian Community Association of Connecticut, on behalf of themselves and those similarly situated, by and through their attorneys, as and for their Complaint, allege the following on information and belief:

## INTRODUCTION

The West African Ebola epidemic had reached its height by October 2014. In between coverage of Connecticut's close gubernatorial race, sensationalist news accounts stoked public fear that travelers might bring Ebola across the ocean to our state. The Centers for Disease

Control and Prevention did not advise quarantining asymptomatic individuals returning from the region, because decades of scientific research shows that asymptomatic individuals cannot transmit Ebola. Yet, contrary to this this expert guidance and scientific evidence, Defendants Governor Dannel Malloy and then-Commissioner of Public Health Dr. Jewel Mullen instituted a policy and practice that authorized legally and scientifically unjustified quarantines of asymptomatic U.S. residents arriving in Connecticut from an Ebola-affected country. None of the Plaintiffs quarantined by Defendants Malloy and Mullen—asymptomatic Liberian immigrants and public health workers—had been in contact with anyone with Ebola symptoms, and at least one of them repeatedly tested negative for the virus. As Defendant Mullen's press spokesperson stated repeatedly in October 2014, Defendants understood that Plaintiffs were "not sick and not a risk to public health." Defendants nevertheless ordered their quarantine.

Defendants Malloy, Mullen, and their staff imprisoned residents in their homes for weeks without adequate notice, a fair process to challenge their confinements, or provision of food and other basic supplies. Defendants and their staff caused local police officers to be stationed outside the homes of those quarantined and to monitor their movements. The police reprimanded Liberian parents who had let their school-aged children open the door from their aunt's basement to play in her small backyard; the children did not step outside again until the end of the quarantine three weeks later. Public health officials yelled at a quarantined student when she tried to pick up a bag of food and tampons left on her fire escape by a classmate.

Even after state officials released the Liberian residents and public health workers, the stigma created by the quarantines continued to affect them and their communities. Neighbors and co-workers shunned Liberian immigrants living in Connecticut. Colleagues and administrators told public health students who had traveled to Liberia to help stop the epidemic that they were

"selfish" for putting Connecticut at risk. Because quarantines accelerated stigma and hampered the travel of healthcare workers, Connecticut's policy undermined the urgent public health response to Ebola.

None of this hardship was necessary. Defendants could have protected residents from Ebola by means that did not violate state and federal law and cause undue stigma against immigrant communities. To this day, the Governor has not revoked his emergency declaration granting the Department of Public Health broad authority to quarantine asymptomatic individuals. Right now, Connecticut residents are abroad in West Africa to help develop emergency public health infrastructure, visit family, and develop transnational religious connections. According to expert public health opinion, the risk of another Ebola outbreak in West Africa is high.  So too is the risk that Defendant Malloy and Defendant Raul Pino, who has succeeded Defendant Mullen as Acting Commissioner of Public Health, will again overreact under the Governor's emergency declaration, which remains in effect, by subjecting Connecticut residents to unjustified and unlawful quarantines.  When Connecticut travelers return, they may not be greeted as welcome neighbors but instead imprisoned in their own homes.

Eight individual Plaintiffs who were subjected to quarantine orders under threat of imprisonment in October 2014 bring this action to remedy violations of the Fourteenth and Fourth Amendments of the U.S. Constitution, Article I of the Connecticut Constitution, the Americans with Disabilities Act, the Rehabilitation Act of 1973, state statutes, and common law torts. Other Plaintiffs, who are in Liberia and will return to Connecticut imminently or who intend to travel to Ebola-affected countries in West Africa in the future, seek declaratory and injunctive relief, on behalf of themselves and a class of others similarly situated, against Connecticut's unlawful and scientifically unjustified quarantine practices, policies, and laws.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 as this is a civil action arising under the Constitution and laws of the United States. This Court has jurisdiction over supplemental claims arising under Connecticut law pursuant to 28 U.S.C. § 1367(a).

2.      Venue lies in the United States District Court for the District of Connecticut pursuant to 28 U.S.C § 1391(b) because at least one defendant is a resident of the District of Connecticut. Venue also lies in this district pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

3.      Plaintiff LOUISE MENSAH-SIEH resides in Connecticut. She is the sister of Plaintiff Nimley-Phillips and is married to Plaintiff Nathaniel Sieh. In October 2014, upon arriving in Connecticut from Liberia, Defendant Mullen, as authorized by Defendant Malloy, subjected her to quarantine. New to the country, she spent twenty days confined in her sister's basement, along with her quarantined husband and children.

4.      Plaintiffs B.D. and S.N. are minor children of Plaintiff Mensah-Sieh. They reside in Connecticut. In October 2014, upon arriving in Connecticut from Liberia, Defendant Mullen, as authorized by Defendant Malloy, subjected them to quarantine for twenty days in the basement of Plaintiff Nimley-Phillips' home.

5.      Plaintiff NATHANIEL SIEH resides in Connecticut and is married to Plaintiff Mensah-Sieh. In October 2014, upon arriving in Connecticut from Liberia, Defendant Mullen, as authorized by Defendant Malloy, subjected him to quarantine for twenty days in the basement of Plaintiff Nimley-Phillips' home.

6.      Plaintiff VICTOR SIEH resides in Connecticut and is the son of Plaintiff Sieh. In October 2014, upon arriving in Connecticut from Liberia, Defendant Mullen, as authorized by Defendant Malloy, subjected him to quarantine for twenty days in the basement of Plaintiff Nimley-Phillips' home.

7.      Plaintiff EMMANUEL KAMARA resides in Connecticut and is the son of Plaintiffs Mensah-Sieh and Sieh. In October 2014, upon arriving in Connecticut from Liberia, Defendant Mullen, as authorized by Defendant Malloy, subjected him to quarantine for twenty days in the basement of Plaintiff Nimley-Phillips' home.

8.      Plaintiff ASSUNTA NIMLEY-PHILLIPS has resided in Connecticut for approximately twenty-five years.  In October 2014, Defendant Mullen, as authorized by Defendant Malloy, caused her to be ordered to be at home to receive multiple daily telephone calls, take the temperatures three times daily of her six quarantined relatives, and in all respects provide and care for her sister's family while it was subjected to quarantine for twenty days in Plaintiff Nimley-Phillips' basement.

9.      Plaintiff LAURA SKRIP is a doctoral candidate at the Yale School of Public Health and resides in New Haven, Connecticut. She returned from a trip to Liberia on October 11, 2014. On October 17, 2014, Defendant Mullen, as authorized by Defendant Malloy, issued a quarantine order for Skrip dated October 10 through October 30, 2014. She is now in Liberia on a public health and research trip and will return to Connecticut on February 28, 2016.

10.     Plaintiff RYAN BOYKO is a former doctoral candidate at the Yale School of Public Health. He returned from a trip to Liberia on October 11, 2014. On October 17, 2014, Defendant Mullen, as authorized by Defendant Malloy, issued a quarantine order for Boyko dated October 10 through October 30. He presently resides in Austin, Texas.

11.    Plaintiff ESTHER YALARTAI is a resident of West Haven, Connecticut and is presently in Liberia with her husband, Plaintiff Bishop Harmon Yalartai, for the Annual Convention of the Faith Revival Temple Churches. She will return to Connecticut on February 20, 2016.

12.    Plaintiff BISHOP HARMON YALARTAI is a resident of West Haven, Connecticut and the religious leader of the Faith Revival Temple Churches, which is comprised of six churches and four preaching points in Liberia, and one church in West Haven. He is presently in Liberia with his wife, Plaintiff Esther Yalartai, for the Annual Convention of the Faith Revival Temple Churches. He will return to Connecticut on February 20, 2016.

13.    Plaintiff DR. MARY JEAN O is a resident of Hamden, Connecticut and a physician specializing in emergency medicine. She volunteered as a clinical coordinator at Ebola Holding Units ("EHU") in Sierra Leone from December 2014 to February 2015. She will return to West Africa in the case of future outbreaks of Ebola or other infectious diseases, to assist in the development of the region's healthcare infrastructure and to teach emergency medicine.

14.    Plaintiff LIBERIAN COMMUNITY ASSOCIATION OF CONNECTICUT ("LCAC") is a non-profit, non-partisan membership organization headquartered in Hartford, Connecticut. LCAC's mission is to contribute to and enhance the social and economic development of the Liberian community in Connecticut, as well as to promote Liberian cultural heritage. Plaintiffs Bishop Yalartai, Esther Yalartai, and Nimley-Phillips are members of LCAC. Members of LCAC, including the Yalartais, regularly travel between Liberia and Connecticut for professional, religious, humanitarian, and personal reasons.

15.    Defendant DANNEL P. MALLOY is Governor of the State of Connecticut. Defendant Malloy issued a declaration of public health emergency on October 7, 2014 and

caused the quarantine of Plaintiffs Mensah-Sieh, her minor children B.D. and S.N., Nathaniel

Sieh, Victor Sieh, Kamara, Skrip, and Boyko. Defendant Malloy's emergency declaration

remains in effect. Defendant Malloy is sued in his official capacity.

16.     Defendant RAUL PINO is the Acting Commissioner of the Connecticut

Department of Public Health ("DPH").  He is sued in his official capacity.

17.     Defendant JEWEL MULLEN was the Commissioner of the Connecticut

Department of Public Health from January 2011 to December 2015.  As authorized by Defendant

Malloy, she signed the quarantine orders of Plaintiffs Skrip and Boyko, directed the quarantine

of Plaintiffs Mensah-Sieh, her minor children B.D. and S.N., Nathaniel Sieh, Victor Sieh, and

Kamara, and caused the oral orders to be delivered to Plaintiff Nimley-Phillips.  Defendant

Mullen is sued in her individual capacity.

## **FACTS**

**2014 Ebola Crisis and Connecticut Response**

18.     On March 23, 2014, the World Health Organization ("WHO") announced an

outbreak of Ebola in West Africa. After the first confirmed case in March 2014, Ebola spread

rapidly throughout Guinea, Liberia, and Sierra Leone.

19.     Ebola is caused by infection with one of the species of the Ebola virus. It is spread

through direct physical contact with the bodily fluids of a symptomatic person, the body of a

person who has died from Ebola, or objects contaminated with the virus, such as used needles.

Ebola cannot be spread through environmental exposure (e.g. air, water) as is possible with other

infectious diseases, such as tuberculosis and cholera. Symptoms include fever, headache, joint

and muscle aches, diarrhea, and vomiting. The incubation period (the time from infection to

onset of symptoms) is usually four to nine days but can range from two to twenty-one days.

20.     By fall 2014, doctors were diagnosing hundreds of new cases each week in West Africa. Over the twenty-two months of the epidemic, there were more than 28,000 cases of Ebola in these three countries and more than 11,000 deaths.

21.     In response to the epidemic, thousands of volunteers from around the world traveled to Guinea, Liberia, and Sierra Leone to provide critical medical assistance and share other forms of technical expertise. Community organizations, including Plaintiff LCAC, and churches run by Liberian immigrants in the United States, like Plaintiff Bishop Yalaratai's, raised funds to support humanitarian aid for Liberians confronting the crisis.

22.     Despite the considerable number of volunteers and staff traveling to and from these countries, the Centers for Disease Control and Prevention ("CDC") noted that there were fewer than forty cases outside of Guinea, Liberia, and Sierra Leone during the crisis.

23.     On August 22, 2014, the CDC publicly released guidance for monitoring people potentially exposed to Ebola. For asymptomatic individuals returning from West Africa with "no risk" or "low risk" of exposure, the CDC recommended only self-monitoring or active monitoring for twenty-one days and recommended no movement restrictions or quarantine.

24.     Even for individuals in the "high risk" exposure level category—such as those who had had direct, unprotected contact with the bodily fluids of an Ebola patient or a dead body— the CDC only recommended "controlled movement" for twenty-one days so long as such individuals were asymptomatic. Under controlled movement, individuals had to inform public health officials of their intended travel and avoid long-distance public transportation.

25.     In October 2014, Defendant Malloy was actively campaigning to be re-elected as Governor of Connecticut, for the election to be held on November 4, 2014. Public polling and media accounts at the time described the gubernatorial race as extremely close.

26.     On October 7, 2014, Defendant Malloy issued an order declaring a public health emergency for the State of Connecticut (hereinafter "Emergency Declaration"). The legal effect of this declaration under state law, as stated in quarantine orders later issued, was to authorize Defendant Mullen, the Connecticut Commissioner of Public Health, to direct the isolation or quarantine of individuals whom she "reasonably believe[d] to have been exposed to, infected with, or otherwise at risk of passing the Ebola virus."

27.     According to the CDC, "isolation" is the separation of individuals who are sick with a contagious disease from those who are not sick. "Quarantine" is the separation of asymptomatic individuals exposed to a contagious disease to see if they become sick.

28.     On October 8, 2014, the CDC announced a safety plan, in collaboration with the Department of Homeland Security ("DHS"), to protect the United States from an Ebola outbreak.

29.     Under the plan, DHS directed persons entering the United States from Guinea, Liberia, and Sierra Leone to one of five ports of entry where it undertook specialized screenings. Trained staff observed travelers for signs of illness, asked them a series of health and exposure questions, and took their temperatures. CDC quarantine station public health officers evaluated travelers with fever or other symptoms, as well as any travelers whose health questionnaires revealed possible Ebola exposure.

30.     When officers determined that passengers required further evaluation or monitoring, federal officers referred those travelers to the appropriate state or local public health authority. Travelers with no symptoms, fever, or a known history of exposure received health information for self-monitoring and were approved to exit the airport.

31.     On October 16, 2014, Defendants Malloy and Mullen established statewide Ebola response policies ("DPH Plan") that the Governor's Office described as "more stringent than the

guidelines thus far issued by the Federal Center for Disease Control and Prevention (CDC)." All asymptomatic individuals who had traveled to affected areas or been in contact with an infected individual were to be quarantined at home for twenty-one days, despite the fact that asymptomatic individuals cannot transmit Ebola.

32.     By contrast, the August 22, 2014 CDC guidance, the federal public health recommendations for best practices at the time, stated that states should impose "no movement restrictions" for asymptomatic individuals who had been "in a country in which an EVD [("Ebola Virus Disease")] outbreak occurred within the past twenty-one days and ha[d] no exposure." The overwhelming consensus in the scientific community at the time was, and remains, that asymptomatic individuals cannot transmit Ebola and do not require quarantine.

33.     Defendants Mullen and Malloy knew that the "[p]eople under quarantine [we]re not sick and not a risk to public health," as a DPH spokesman repeatedly stated in October 2014, but nevertheless imposed and maintained their quarantine under the DPH Plan. (Exhibit A). Defendant Mullen approved this statement.

34.     Defendants Mullen and Malloy knew that their policy and practice of quarantine was retrograde and ill-suited to contemporary public health challenges. In an email message, DPH epidemiologist Matt Cartter described Connecticut's legal definition of quarantine as "very 19th century, making 21st century quarantine options difficult to implement."

35.     On October 27, 2014, after Defendants had already quarantined Plaintiffs Mensah-Sieh, her minor children R.M and D.M, Nathaniel Sieh, Victor Sieh, Kamara, Skrip, and Boyko, Defendants Malloy and Mullen announced new state policies for Ebola response ("Revised DPH Plan").  The Revised DPH Plan imposed "mandatory active monitoring" for asymptomatic travelers arriving in Connecticut from Guinea, Liberia, and Sierra Leone, but still

contemplated "quarantine for individuals based on risk factors." Revised guidance from the CDC released that same day did not recommend quarantine for any asymptomatic individuals and recommended "no restrictions on travel, work, public conveyances, or congregate gatherings" for asymptomatic individuals, like previously-quarantined Plaintiffs, who had been in an affected country but had no known exposure.

36.    The Revised DPH Plan also required DPH to conduct an individualized risk assessment for such travelers before deciding whether to take steps beyond active mandatory monitoring. Local health department staff or DPH epidemiologists were to interview travelers about their travel history and potential exposure to Ebola. Epidemiological experts at DPH would assess this information and its quality before making a decision. On information and belief, Defendants failed to reconsider Plaintiffs' quarantine orders under the Revised DPH Plan, and required Plaintiffs to remain in quarantine for an additional three to twelve days.

37.    On November 7, 2015, December 29, 2015, and January 14, 2016, the WHO declared Sierra Leone, Guinea, and Liberia Ebola-free, respectively.

38.     According to expert public health opinion, Liberia, Sierra Leone, and Guinea remain at high risk of future Ebola outbreaks and this area could potentially face another large outbreak.

39.    According to the DPH Ebola Preparedness and Response webpage, last modified January 7, 2016, "Governor Malloy's declaration on October 7, 2014 of a public health emergency for Connecticut for the duration of the Ebola epidemic in West Africa remains in effect."

40.    Because Defendant Malloy's Emergency Declaration remains in effect, Defendants Malloy and Pino reserve the power to exceed the guidance of the CDC and the

consensus of the scientific community by imposing "more stringent restrictions" on asymptomatic individuals, including quarantine.

41.    Despite the evolution from the DPH Plan to the Revised DPH Plan to current policies, Defendants have maintained a policy, practice, custom, and usage of failing to impose the least restrictive means to prevent Ebola infections; failing to base their decisions in science and evidence rather than politics and fear; failing to give quarantined people timely notice in writing, or ever; failing to affirmatively seek judicial review, where the state would bear the burden to establish the necessity of quarantine by clear and convincing evidence; and failing to provide for the welfare and safety of those subject to quarantine (hereinafter "Defendants' quarantine policies and practice").

42.    Pursuant to Defendants' quarantine policies and practice, and regardless of the shift from the DPH Plan to the Revised DPH Plan to current policy, Defendants have repeatedly maintained quarantines of individuals they knew "[we]re not sick and not a risk to public health," and reserve their right to do so in the future.

43.    Because the risk of a future Ebola outbreak in West Africa is high, because Defendants reserve the authority to issue scientifically unjustified and unlawful quarantine orders pursuant to Defendant Malloy's unrescinded emergency declaration, and because it is highly likely that Defendants will again overreact to a future Ebola outbreak, Plaintiffs and other present and future travelers from Liberia, Guinea, and Sierra Leone are at real and immediate risk of being subject to Defendants' quarantine policies and practice.

**Quarantine of Public Health Students Boyko and Skrip**

44.    In September 2014, after encouragement from their Ph.D. advisor at Yale University, Plaintiffs Boyko and Skrip traveled to Liberia to assist the Liberian Ministry of

Health and Social Welfare with data analysis of the 2014 outbreak. Boyko and Skrip hoped that their skills in mathematics, data analysis, and technology would aid the project of digitally tracking Ebola cases in Liberia.

45.     Boyko and Skrip left John F. Kennedy International Airport in New York on September 17, 2014 and arrived in Monrovia, Liberia on September 18, 2014.

46.     While in Liberia, Boyko and Skrip volunteered with the Ministry of Health and Social Welfare to create a computerized Ebola-case tracking system. During their stay, they developed a cloud-based Android app that improved contact tracing of Ebola cases in Liberia and provided a computer interface for visualizing this data.

47.     Boyko and Skrip did not volunteer in a healthcare capacity and did not treat patients. They did not have contact with any Ebola-symptomatic individuals.

48.     While in Liberia, Boyko and Skrip worked in the Ministry of Health and Social Welfare's government building. They ate breakfast and dinner at their hotel and brought food from the hotel to work with them for lunch. They were transported in a private car between the hotel and the government building in order to avoid contact with people with Ebola symptoms.

49.     Boyko and Skrip took numerous additional precautions while in Liberia, including observing a "no touching" policy, not using public transportation, frequently cleaning their shoes by stepping on foam blocks soaked in chlorine solution, and frequently washing their hands with sanitizer or chlorine solution.

50.     Boyko and Skrip planned to return to the United States on October 3, 2014, but Boyko developed a minor cough that he believed to be a lingering symptom of an illness he had prior to leaving for Liberia. Fearful that any display of sickness en route could result in panic and even diversion of the airplane, and upon the advice of the Yale Health Center, Boyko decided to

delay his return.  Skrip felt fine but decided to remain with Boyko in Liberia.

51.     Boyko felt better after approximately two days, at which point Boyko and Skrip began planning their return to Connecticut.  As a condition of compensating Boyko and Skrip for a replacement flight, Yale's travel medical insurance company required Boyko to be tested for Ebola by a medical professional.

52.     In the course of revising their travel plans, Boyko and Skrip had numerous communications with Yale faculty and staff.

53.     On October 6, 2014, Boyko tested negative for Ebola. He received a handwritten letter confirming the negative test from a United States Army colonel supervising the testing lab. Shortly thereafter, Boyko and Skrip scheduled a return flight to the United States.

54.     Before leaving, Boyko and Skrip learned that one person who sometimes spent time at their hotel, a freelance cameraman, later developed symptoms of Ebola. Out of an abundance of caution, Boyko and Skrip spoke with local CDC agents to be sure that they were not at risk as a result. The CDC representatives assured Boyko and Skrip that this was a "no risk" interaction as the cameraman had not become contagious until after the last time they saw him.

55.     Early in the morning of October 11, 2014, Boyko and Skrip departed Monrovia, Liberia by plane. Upon arrival at John F. Kennedy International Airport on October 11, 2014, they underwent the CDC entry screening procedures for Ebola. Both Boyko and Skrip were ruled medically fit under those procedures. Officials of the U.S. Department of Homeland Security allowed them both to enter the United States.

56.     DHS or CDC officials alerted Defendant Mullen or her staff of the return of Boyko and Skrip, pursuant to the CDC guidelines regarding referral to local public health departments.

57.     After returning to New Haven that day, Boyko and Skrip monitored themselves for symptoms of Ebola. As part of their monitoring efforts, Boyko and Skrip took their temperatures twice a day and emailed results to staff at the Yale Health Center.

58.     On the morning of October 15, Boyko's temperature rose to 100.1 degrees Fahrenheit. Boyko informed a member of Yale Health. Although he felt fine, the Yale Health Center and Yale-New Haven Hospital jointly decided to transport him from his home to the hospital.

59.     At approximately 11 p.m. on October 15, an ambulance arrived to take Boyko to Yale-New Haven Hospital.

60.     On information and belief, Yale Health, Yale-New Haven Hospital, or other Yale officials informed state and city public health officials of Boyko's hospital admission.

61.     After Boyko was admitted to the hospital, doctors took samples of his blood and sent them to the CDC and the Massachusetts State Public Health laboratory for Ebola testing.

62.     While in the Medical Intensive Care Unit, Boyko's fever subsided.

63.     On October 16, 2014, the day after Boyko arrived at the hospital, Plaintiff Skrip received a call from the City of New Haven Health Department's epidemiologist, Amanda Durante. Durante informed Skrip that the City of New Haven would begin "mandatory active monitoring" of Skrip.  This meant the City would call twice a day at which time Skrip was required to take and report her temperature.

64.     Later that day, October 16, 2014, Boyko's first U.S. test results returned negative for Ebola.

65.     Despite Boyko's negative test result, Defendant Mullen, amid a frenzy of media attention to Ebola abroad and the perceived threat at home, caused the delivery of an isolation

order for Boyko, authorized under Defendant Malloy's Emergency Declaration and Defendants Malloy and Mullen's DPH Plan. The order required Boyko to remain in hospital isolation for twenty-one days. It did not mention his negative test result, nor did it include information about how he could legally challenge his isolation.

66.     On October 17, the CDC confirmed that Boyko's blood tested negative for Ebola.

67.     Upon receiving the blood test result, doctors at Yale-New Haven Hospital told Boyko that he was healthy, without symptoms, and had no reason to take any kind of further precautions. His doctors removed their protective gear and shook his hand. They joked that Boyko was the only person in New Haven they could definitively say did not have Ebola.

68.     Shortly thereafter, on October 17, Defendant Mullen issued a quarantine order, requiring that Boyko be confined in his home for twenty-one days, or up to and including October 30. The order was backdated to October 10 and signed by Defendant Mullen. Defendant Mullen, as authorized by Defendant Malloy, caused the order to be delivered to Yale-New Haven hospital, and upon information and belief, directed medical staff there to serve the order on Boyko. A copy of the order is attached as Exhibit B.

69.     The quarantine order did not mention that Boyko had tested negative for Ebola three times.

70.     The order stated that an individual who violates his or her quarantine may be subject to sanctions, including imprisonment and fines.

71.     Late in the afternoon of October 18, a plainclothes hospital security officer drove Boyko to his apartment in New Haven in an unmarked car.

72.     On October 17, 2014, on the same day Defendant Mullen signed Boyko's quarantine order, Defendant Mullen also signed an order subjecting Skrip to a mandatory

16

quarantine. The order was backdated to October 10. On that date, Defendant Mullen, as authorized by Defendant Malloy, caused Durante and staff from the office of Defendant Malloy to telephone Skrip to inform her that she was quarantined.

73.     On that joint call, Defendants Malloy and Mullen caused Durante and Defendant Malloy's staff to state that Skrip was forbidden from leaving her apartment. At the time of her quarantine, Defendants failed to provide or cause others to provide Skrip notice of her rights, information about how to challenge the quarantine, or a written notice of quarantine.

74.     Skrip informed Maria Bouffard, the Director of Emergency Management at Yale University, that she had never received a quarantine order. On or around October 22, 2014, five days after Defendant Mullen caused Skrip to be informed orally that she was subject to quarantine, and twelve days after the effective date of the order, someone from the City of New Haven provided a copy of the order to Skrip. A copy of the order is attached as Exhibit C.

75.     The order stated that an individual who violates his or her quarantine may be subject to sanctions, including imprisonment and fines.

76.     On information and belief, Defendant Mullen, as authorized by Defendant Malloy, through the State's quarantine order, required the New Haven Police Department ("NHPD") to enforce the quarantines against Boyko and Skrip. NHPD stationed a police officer outside the apartments of both Boyko and Skrip twenty-four hours per day, during Defendants' quarantine of them. On information and belief, at least one NHPD officer told Skrip's neighbors that an individual with Ebola was living in her building.

77.     Defendants Malloy and Mullen failed to direct officials to supply the homes of Boyko and Skrip with sufficient food and other essential supplies for the duration of their quarantines, as required by law.

78.     No state or city agency provided assistance to ensure Boyko or Skrip had adequate food, toiletries, and other life necessities. Neither Skrip nor Boyko was able to shop for food or other essentials after returning from Liberia and before being placed under quarantine.

79.     Ryan was able to eat only because Bouffard delivered Visa gift cards that enabled him to purchase needed supplies. Under orders from Defendants, NHPD allowed Boyko to step outside to pick up such deliveries, but only if he immediately returned to his apartment.

80.     After an NHPD officer confronted a friend who dropped off food and sanitary supplies on Skrip's fire escape, Skrip was too afraid to order additional food with the Visa gift cards provided by Yale.

81.     By their actions, Defendants transformed the homes of Skrip and Boyko into their prisons. Skrip and Boyko were unable to leave and police officers constantly stood watch outside their doors.

82.     While in quarantine, Boyko became depressed. He was cut off from family, friends, and colleagues.

83.     During quarantine, Boyko was unable to spend time with his young son, of whom Boyko shares custody. Even following Boyko's quarantine, his former wife had concerns about allowing him to spend time with his son, due to her perception that the State considered Boyko a danger to others.

84.     Boyko was also unable to see his girlfriend, who the quarantine order prohibited from entering their shared apartment.

85.     Boyko was unable to keep up with his professional and educational obligations. He had to cancel plans to present at an international public health conference, and fell behind on his progress towards his degree. Boyko was also unable to continue his paid employment as a

teaching assistant at Yale College and as an employee of the Global Health Justice Partnership.

86.     Despite implementation of the Revised DPH Plan on October 27, Defendant Mullen did not review or cause the review of the quarantine orders against Boyko or Skrip. On information and belief, Plaintiffs never benefited from any such individualized assessment by Defendant Mullen, local health department staff, or an epidemiologist from DPH.

87.     Defendant Mullen, as authorized by Defendant Malloy, originally ordered Boyko quarantined through October 30, 2014. However, Boyko requested to be released a day early given that the state's power to quarantine, absent a renewed order, is limited to 20 days.  Conn. Gen. Stat. § 19a-131b(c).

88.     Shortly thereafter, Boyko received an email from state officials forwarded to Boyko by Bouffard saying the quarantine would end at 12:01 a.m. on October 30, 2014. Late in the evening of October 29, 2014, NHPD withdrew their officers stationed outside the homes of Boyko and Skrip, and at 12:01 a.m. on October 30, 2014, Defendants Mullen and Malloy released Boyko and Skrip from quarantine.

89.     Even after the quarantine ended, Boyko continued to grapple with the after effects of the isolation and quarantine.

90.     Shortly after the quarantine, Boyko and his girlfriend broke up, in significant part due to the stress of the quarantine. His relationship with his former wife has been strained since their custody disagreement during the quarantine.

91.     Boyko has experienced depression and social aloofness from the lack of contact he experienced during quarantine. In spring 2015, Boyko sought psychological care to cope with the emotional impact of the quarantine. In 2015, Boyko left his assigned lab and dropped out of the Ph.D. program at Yale University.

92.     Skrip also grappled with many adverse consequences during and after the quarantine. The quarantine interfered with her graduate research work and her research assistant position at Yale University. The quarantine also prevented performance of her duties as a volunteer co-director for a department of the Haven Free Clinic. The experience of the quarantine strained and continues to strain Skrip's professional and volunteer relationships.

93.     Defendants Malloy and Mullen knew or should have known that their quarantine of Boyko and Skrip was scientifically unjustified and not the least restrictive means to protect public health; that Defendants failed to provide essential supplies to Boyko and Skrip; that Defendants imposed the quarantine orders without a state-initiated judicial probable cause hearing before or immediately after Defendants seized Boyko and Skrip; and that the quarantine of Skrip was instituted without timely notice.

94.     Defendants Malloy and Mullen knew or should have known that their quarantine of Boyko and Skrip discriminated against Plaintiffs due to Plaintiffs' perceived risk of illness by severely diminishing their everyday life activities including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

95.     Defendant Mullen knew or should have known that her reckless conduct in ordering and carrying out Boyko and Skrip's quarantines would unlawfully detain and confine them, cause their reasonable apprehension of force, interrupt their ability to perform their work, and inflict emotional distress on them.

**Quarantine of Mensah-Sieh Family**

96.     Plaintiff Nimley-Phillips came from Liberia to the United States in the 1980s, when she moved to Connecticut to pursue a Masters degree. She returned permanently several years later and has resided in Connecticut ever since.

97.     Plaintiff Mensah-Sieh (who is the sister of Nimley-Phillips), her husband Plaintiff Nathaniel Sieh, and their four children Emmanuel Kamara, Victor Sieh, B.D., and S.N., lived in Sinkor, Monrovia in Liberia until October 2014. In Sinkor, Nathaniel Sieh worked in immigration for the government and Mensah-Sieh worked for Global Bank and at St. Joseph's Catholic Hospital.

98.     Prior to the Ebola outbreak, the Mensah-Sieh family applied to the U.S. Diversity Visa Lottery and in June 2013 learned that they would be awarded visas. Plaintiffs were excited by the opportunity to emigrate to the U.S. to improve their lives and career prospects and to provide educational opportunities for their children.

99.     To make arrangements, the Mensah-Sieh family went to the U.S. Embassy, which in turn sent them to St. Joseph's Catholic Hospital to undergo a series of health tests. The family paid fees in order to have the necessary tests and paperwork completed. The officials in charge of the Mensah-Siehs' health records sealed these records, and the family never saw the results.

100.    Based upon their health tests and other paperwork, the relevant DHS and U.S. Embassy officials approved the Mensah-Sieh family to leave Liberia for the U.S. in fall 2014.

101.    The Mensah-Sieh family left Liberia on Friday, October 17, 2014 and arrived at John F. Kennedy International Airport in New York on Saturday, October 18, 2014.

102.    Upon deplaning, DHS officials took the family into a separate room, away from other travelers, and questioned them for about an hour. The officials examined and took the family's health-related documentation, which the family never received back. The officials asked the family about their travel plans, their contacts in Liberia, and their U.S. address.

103.    At the airport, neither DHS nor CDC officials provided the Mensah-Sieh family with any information, written or oral, related to quarantine. The officials did not instruct the

21

Mensah-Sieh family to monitor any symptoms or check their temperatures.

104.    DHS or CDC officials notified Connecticut state and municipal public health officials of the arrival of the Mensah-Sieh family on October 18, 2014.

105.    When the DHS officials at the airport allowed the Mensah-Sieh family to leave, the family walked out to be picked up at the curb. Nimley-Phillips was waiting for them, as planned, with a large van.

106.    Nimley-Phillips drove the Mensah-Sieh family to her house.

107.    From Saturday, October 18 until Monday, October 20, neither Nimley-Phillips nor the Mensah-Sieh family received any quarantine order, written or oral.

108.    Nimley-Phillips had heard from others in the West African community that those traveling from countries affected by Ebola were not generally supposed to leave the house or have contact with others for a period of time to ensure that they were not ill. To that end, the family stayed close to Nimley-Phillips' house after they arrived.

109.    The morning after they arrived, Emmanuel Kamara, Victor Sieh, B.D., and S.N. went outside into Nimley-Phillips' yard to see the surroundings and to take pictures of their new life to send back to friends in Liberia. While outside, the brothers noticed that the next-door neighbor called her child in from the backyard and looked at them in a frightened manner.

110.    Upon information and belief, the neighbors called the police. Shortly after the children had gone out into the yard, Nimley-Phillips received a phone call from an unidentified individual informing her that the family was not allowed outside. The caller did not instruct Nimley-Phillips that the family was under a quarantine order.

111.    On Monday, October 20, a woman who identified herself as Maureen Lillis, West Haven Director of Public Health, called Nimley-Phillips to inform her of the quarantine of the

Mensah-Sieh family. Upon information and belief, Defendant Mullen, pursuant to DPH's pattern and practice, ordered the quarantine and caused Lillis to communicate this information.

112.    On this call, Lillis stated that the Mensah-Sieh family was not allowed to leave the house for twenty-one days and that Nimley-Phillips was required to monitor the Mensah-Sieh family's health by asking them if they exhibited any symptoms and taking each family member's temperature three times per day. Lillis informed Nimley-Phillips that a city health official would call her three times daily to inquire about the family's health information. Lillis stated that she knew Nimley-Phillips "had [her] hands full" with the family, or words to that effect.

113.    When Nimley-Phillips asked if the City or State would provide equipment to help her monitor the Mensah-Sieh family's health, Lillis said they would provide a thermometer. But Nimley-Phillips never received any health equipment from Defendants or the City. Instead, she purchased a thermometer, Clorox, rubber gloves, and other supplies. When she learned that an infrared thermometer would be more hygienic, Nimley-Phillips purchased a second thermometer.

114.    Following the phone call, Defendants or their staff directed the West Haven Police Department ("WHPD") to monitor Nimley-Phillips' house to enforce the quarantine of the Mensah-Sieh family. The WHPD was stationed outside the home twenty-four hours per day, seven days a week. Defendants caused WHPD to prevent the Mensah-Sieh family from leaving Nimley-Phillips' house and anyone except Nimley-Phillips and her adult daughter from entering.

115.    Defendant Mullen, as authorized by Defendant Malloy, caused Helen Johnson, a West Haven nurse, to call Nimley-Phillips three times a day to collect health information on the Mensah-Sieh family.

116.    Defendants Mullen and Malloy never served or caused to be served any written quarantine order on the Mensah-Sieh family, nor did they serve the family with any other written

information about quarantine practices or the family's right to judicial review of the order.

117.    Defendants Malloy and Mullen and their staffs failed to instruct Lillis or any other official to inform Nimley-Phillips or the Mensah-Sieh family on the October 20 phone call or in any subsequent communication of their right to challenge the quarantine order or how the order could be challenged.

118.    Defendants Malloy and Mullen failed to cause Nimley-Phillips and the Mensah-Sieh family to receive written notice of the quarantine order. Defendants Malloy and Mullen failed to cause Nimley-Phillips and the Mensah-Sieh family to receive written information about the parameters of the quarantine or best practices.

119.    During the twenty-one days of quarantine, up to and including November 10, 2014, the six members of the Mensah-Sieh family stayed in a single room in Nimley-Phillips' basement. The family slept two on a couch, two on an air mattress, and two in a bed. The family was constantly cold in the poorly insulated basement, heated only by small space heaters. Sometimes, all six would huddle in the bed together, under blankets, to keep warm.

120.    Because they were cold, the family could not generally open the windows for fresh air. The door that connected the basement to the upstairs living areas of Nimley-Phillips' house remained closed. At meal times, Nimley-Phillips would leave food outside the door so that the family could bring food downstairs to eat.

121.    Nimley-Phillips purchased food and prepared meals for the Mensah-Sieh family for the duration of their quarantine. Defendants Malloy and Mullen did not instruct anyone to provide food for the quarantined family or to reimburse Nimley-Phillips for these expenses.

122.    Bishop Yalartai and one of Nimley-Phillips' neighbors tried on several occasions to bring milk and bread for the family, but the WHPD police, acting under Defendant Mullen's

order to enforce the quarantine, denied the Bishop and neighbor entry to the home.

123.    Each time Nimley-Phillips and her adult daughter entered and exited their home, the police officers stationed outside pursuant to Defendants' order to enforce the quarantine would question them about where they were going and check their identification. At night, the police officers would shine lights on Nimley-Phillips and her daughter when they entered and left the house. Nimley-Phillips was frightened by the bright lights and felt as though the police were treating her like a criminal.

124.    On at least one occasion, the WHPD officers, acting under Defendants' order to enforce the quarantine, detained Nimley-Phillips on her way back into her house. The WHPD officer on duty called the WHPD station to make sure that Nimley-Phillips was approved to enter her own home.

125.    The WHPD police stationed outside Nimley-Phillips' home, acting under Defendants' order to enforce the quarantine, prevented anyone other than Nimley-Phillips and her daughter from entering the house. When Nimley-Phillips' daughter ordered pizza for the Mensah-Sieh children, the police told her that the paper money she handled and brought from inside the house was "contaminated."

126.    Despite implementation of the Revised DPH Plan on October 27, Defendants Mullen and Malloy did not review or cause the review of the quarantine orders against members of the Mensah-Sieh family. Plaintiffs never benefited from any individualized determination by Defendant Mullen, local health department staff, or an epidemiologist from DPH.

**Effects of the Mensah-Sieh Family Quarantine on Nimley-Phillips**

127.    Defendants Mullen and Malloy caused Lillis to communicate to Nimley-Phillips over the phone that she must monitor the Mensah-Sieh family's health. Defendants Mullen and

Malloy also caused Nurse Johnson to enforce that direction by calling Nimley-Phillips three times each day to collect health information on the Mensah-Sieh family.

128.    Because Defendant Mullen, as authorized by Defendant Malloy, caused WHPD police officers to prevent anyone other than Nimley-Phillips and her daughter from entering the house, no one else could help care for the Mensah-Sieh family for the period of quarantine. As a result, Defendants caused Nimley-Phillips to carry out the quarantine of the Mensah-Sieh family, including feeding and monitoring the health of the family.

129.    Defendants Malloy and Mullen failed to provide or cause others to provide Nimley-Phillips with any medical equipment or disinfectant to carry out her obligations to monitor the Mensah-Sieh family's health or to keep herself safe.

130.    As a result, Defendants caused Nimley-Phillips to incur out of pocket expenses to maintain the quarantine of the Mensah-Sieh family. Nimley-Phillips purchased cleaning supplies, including Clorox bleach and rubber gloves, to prevent herself and her adult daughter from potentially becoming ill.

131.    Nimley-Phillips also purchased a standard thermometer and a more expensive infrared thermometer in order to comply with the requirements Defendants Mullen and Malloy caused Lillis to communicate to Nimley-Phillips to take the temperature of each member of the Mensah-Sieh family three times daily.

132.    During the period of quarantine, Defendants Malloy and Mullen caused Nimley-Phillips to purchase and prepare meals for the six members of the Mensah-Sieh family.

133.    Defendant Mullen knew or should have known that her reckless conduct in causing Nimley-Phillips to carry out the quarantine of the Mensah-Sieh family unreasonably detained and confined Nimley-Philipps, caused her reasonable apprehension of force, and caused

her to perform actions, including taking temperature of the Mensah-Sieh family and incurring out-of-pocket expenses.

**Effects of the Quarantine on the Mensah-Sieh family**

134.   Defendant Mullen recklessly caused the Mensah-Sieh family to be scared, embarrassed, and sad by authorizing and ordering the unjustified quarantine.

135.   Defendant Mullen recklessly caused Mensah-Sieh to be treated like a criminal: locked away so that she could not do harm to society. She knew that she was healthy, but she constantly worried that Defendants would take her or her children away if they exhibited any symptoms, which included minor ailments that could be induced by stress, such as an upset stomach or loose stools. During the twenty-one days of quarantine, Mensah-Sieh felt that she would have preferred to stay in Liberia because the conditions of her family's confinement were so uncomfortable and the duration was so long.

136.   Defendant Mullen recklessly caused Nathaniel Sieh to feel stigmatized and embarrassed to be confined to the basement. DHS agents had screened him at John F. Kennedy International Airport in New York, so he knew he was not sick. Nathaniel Sieh felt ashamed being kept in the house as though he were ill or someone who should be avoided.

137.   Defendant Mullen recklessly caused the Mensah-Sieh family to suffer because their children were frightened.

138.   Defendant Mullen recklessly caused B.D. and S.N. to become concerned that they were sick or that something was wrong with them because they were kept in quarantine.

139.   Defendant Mullen recklessly caused the Mensah-Sieh family to suffer additional physical discomfort because their activity and movements were constrained during the quarantine. All members of the family felt stiff and uncomfortable because they could not

exercise or move around outdoors during the three weeks of quarantine.

140.     Defendant Mullen recklessly prevented Nathaniel Sieh from beginning his search for employment during the duration of the quarantine.

141.     After Defendants' quarantine of the Mensah-Sieh family expired, Nathaniel Sieh applied for jobs immediately. Because of media coverage of Ebola and the quarantine of a family of six, Nathaniel Sieh believes that potential employers had the health scare in their minds when, during interviews, they learned he had just immigrated from Liberia.

142.     Defendant Mullen recklessly prevented Mensah-Sieh from beginning her search for employment during the duration of the quarantine. She was not able to find work until February or March 2015.

143.     Defendant Mullen recklessly prevented Victor Sieh, B.D., and S.N. from enrolling in school until their quarantine had ended. As a result, the children enrolled at school approximately a month after their arrival in the U.S.

144.     Before B.D. and Victor Sieh enrolled in school, an announcement was made at their high school about Ebola and the local quarantine. When B.D. and Victor arrived at school following the quarantine, their peers knew about the quarantine and also knew that the Mensah-Siehs were new immigrants from Liberia. Classmates asked B.D. if he had been quarantined.

145.     Defendant Mullen recklessly prevented Mensah-Sieh, her minor children B.D. and S.N., Nathaniel Sieh, Victor Sieh, and Kamara from forming social contacts with the local Liberian-American community in Connecticut. Defendant Mullen recklessly prevented B.D., S.N., Victor Sieh, and Kamara from meeting children and young adults and developing friendships in their new country.

146.     Defendants Malloy and Mullen knew or should have known that their quarantine

of the Mensah-Sieh family was scientifically unjustified and not the least restrictive means to protect public health; that Defendants failed to provide essential supplies to the Mensah-Sieh family; that Defendants imposed the quarantine orders without a state-initiated judicial probable cause hearing before or immediately after Defendants seized the Mensah-Sieh family; and that the quarantine of the Mensah-Sieh family was done without timely notice in writing.

147.     Defendant Mullen knew or should have known that their quarantine of the Mensah-Sieh family discriminated against Plaintiffs due to their perceived risk of illness by severely diminishing their everyday life activities including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

148.     Defendant Mullen knew or should have known that her reckless conduct in ordering and carrying out the quarantine of the Mensah-Sieh family unreasonably detained and confined the family and caused their reasonable apprehension of force.

**Connecticut Residents About to Return from Liberia**

149.     On January 24, 2016, Skrip traveled to Monrovia, Liberia to volunteer again with the Ministry of Health and Social Welfare.

150.     She is working with the University of Liberia on epidemiology and mathematical modeling that she hopes will improve the ability of Liberia's health infrastructure to respond effectively to future outbreaks of Ebola. Skrip has not volunteered in a healthcare capacity and will not treat patients.

151.     Skrip has an airplane ticket to return to Connecticut on February 18, 2016.

152.     In approximately April 2016, Skrip plans to start making regular trips to Liberia to continue her work in epidemiology, mathematical modeling, and health infrastructure. During this time, Skrip intends to maintain her domicile in Connecticut, where she is registered to vote,

maintains a driver's license, and pays state taxes.

153.    Skrip's experience with the Defendants' quarantine policies and practices continues to affect her current and future travel plans to visit West Africa and return to Connecticut. She makes these plans under the reasonable fear of being subjected to another unjustified and unlawful quarantine.

154.    Plaintiffs Bishop and Esther Yalartai, husband and wife, were born in Liberia and have resided in Connecticut since approximately 1990. Bishop Yalartai is the religious leader of the Faith Revival Temple Churches, which is comprised of five churches and four preaching points in Liberia, West Africa, and one church in West Haven, Connecticut. Together, these churches number around 2,500 members in Liberia and the United States.

155.    Bishop and Esther Yalartai are presently in Liberia on a trip to attend the Annual Convention of the Faith Revival Temple Churches, to conduct humanitarian work with Liberian schools, and to visit family members. They have airplane tickets to return to Connecticut on February 20, 2016.

156.    In the future, Bishop and Esther Yalartai intend to travel to Liberia once or twice annually, to continue to oversee the work of the Faith Revival Temple Churches.

157.    Bishop and Esther Yalartai reasonably fear that they may be subject to Defendants' quarantine policies and practices, which are unlawful and scientifically unjustified, upon their return to Connecticut later this month or following future trips to Liberia.

158.    There is a real and immediate threat that Defendants Malloy and Pino will quarantine Plaintiffs Skrip, Bishop Yalartai, and Esther Yalartai upon their return to Connecticut, pursuant to Defendants' quarantine policies and practice, because the risk of a future Ebola outbreak in West Africa is high, because Defendants reserve the authority to issue scientifically

unjustified and unlawful quarantine orders pursuant to Defendant Malloy's unrescinded emergency declaration, and because it is highly likely that Defendants will again overreact to a future Ebola outbreak.

**Connecticut Residents Who Intend Future Travel to West Africa**

159.     The Mensah-Sieh family plans to travel back to Liberia to visit friends and family. They remain concerned that they may be subjected to future quarantines upon their return to Connecticut.

160.     Plaintiff Dr. Mary Jean O is a licensed emergency medicine physician currently working at the Robert Wood Johnson University Hospital ("RWJUH") and the Rutgers Robert Wood Johnson Medical School ("RWJMS") in New Brunswick, New Jersey. Her primary residence is in Hamden, Connecticut.

161.     In late 2014, a friend of Dr. O informed her that the International Rescue Committee ("IRC"), a humanitarian organization, needed doctors to volunteer to travel to West Africa to respond to the Ebola crisis. Dr. O volunteered and arranged a leave of absence with RWJUH and RWJMS.

162.     Between December 2014 and February 2015, Dr. O worked as a clinical coordinator at multiple Ebola Holding Units ("EHUs") in Sierra Leone. She served in Port Loko and John Thorpe, two of the hardest hit communities in Freetown.

163.     Because malaria produces symptoms similar to early Ebola symptoms, EHUs serve to filter patients presenting with Ebola-like symptoms into Ebola Treatment Units. In the EHUs, Dr. O used her expert training in emergency medicine and disaster response to triage patients, send blood samples out for Ebola testing, and begin hydration and other basic treatment. She also trained local staff in protocols for personal protective equipment ("PPE") and best

medical practice for Ebola response, and oversaw the general operation of the EHU.

164.     When Dr. O returned to the United States in February 2015, she flew into John F. Kennedy International Airport and underwent enhanced entry screening for travelers returning from West Africa. She completed twenty-one days of active monitoring upon her return to Connecticut, but never developed a fever or other symptoms.

165.     Dr. O plans to return to West Africa to assist in the region's capacity building and development of its healthcare infrastructure, so that it may better respond to future Ebola outbreaks or other public health emergencies. In particular, she plans to train local healthcare workers in her specialty of emergency medicine and disaster response. She also has strong connections to Liberia and a number of Liberian physicians and nurses, due to visits during her residency training prior the 2014 Ebola crisis.

166.     In addition, Dr. O plans to immediately travel to West Africa in the event of a future Ebola outbreak or other health crisis.

167.     Dr. O reasonably fears that Defendants' may subject her to unlawful and scientifically unjustified quarantine policies and practices upon her return to Connecticut.

168.     Plaintiff Liberian Community Association of Connecticut ("LCAC") is a non-profit organization headquartered in Hartford, Connecticut with over 230 members. Members of LCAC pay quarterly dues of $25.00, totaling $100.00 a year. The LCAC Constitution bestows members with voting and governance rights within the organization.

169.     LCAC aims to enhance the social and economic development of the Liberian community in Connecticut. The organization also contributes to development efforts in Liberia, including a scholarship program the organization runs at the University of Liberia. LCAC regularly organizes programming and services for its members in Connecticut and provides

support and information to Connecticut residents who have recently emigrated from Liberia. LCAC additionally works to establish and maintain strong connections between the Liberian community in Connecticut and communities in Liberia.

170.   As part of these efforts, LCAC has collaborated with the Faith Revival Temple Church in West Haven, Connecticut to collect donations of medical supplies including antibacterial wipes, gloves, and masks to ship to areas of West Africa affected by Ebola.

171.   Defendants' quarantine policies and practice caused and continues to cause LCAC to divert resources in response. In and after October 2014, LCAC assisted members who experienced stigma because of public fear—generated by Defendants' quarantine orders—that Liberian individuals may carry the illness.

172.   Dozens of LCAC members travel each year between Liberia and Connecticut for professional, religious, humanitarian, and personal reasons. Many members have current and future plans to travel between the two countries.

173.   For example, LCAC's Education Chair, Dr. Emmett Dennis, travels between Connecticut and Liberia twice annually to administer LCAC's scholarship program at the University of Liberia. Plaintiffs Bishop and Esther Yalartai, members of LCAC, will return from Liberia to Connecticut on February 20, 2016.

174.   There is a real and immediate threat that pursuant to Defendants' quarantine policies and practice, Defendants Malloy and Pino will quarantine Dr. O, members of the Mensah-Sieh family, and members of LCAC in the future, because the risk of a future Ebola outbreak in West Africa is high, because Defendants reserve the authority to issue scientifically unjustified and unlawful quarantine orders pursuant to Defendant Malloy's unrescinded emergency declaration, and because it is highly likely that Defendants will again overreact to a

future Ebola outbreak.

## DEFENDANTS' POLICY, PRACTICE, AND CUSTOM

175.    Since at least October 2014, Defendants Malloy, Mullen, and Pino have violated or still threaten to violate the rights of individuals in Connecticut through Defendants' quarantine policies and practice, including but not limited to:

(a)    imposing quarantines without an individual assessment of medical necessity;

(b)    failing to notify quarantined persons of their rights by providing timely notice, and sometimes failing to provide written notice altogether;

(c)    failing to provide individuals a meaningful opportunity to challenge their quarantine;

(d)    failing to initiate a judicial probable cause hearing prior to imposing  a quarantine order, and where exigent circumstances do not permit a pre-quarantine hearing,  failing to initiate a hearing within forty-eight hours for judicial review of any quarantine order, at which hearing individuals could be represented by counsel, present opposing evidence and argument, and cross examine witnesses;

(e)    failing to utilize the least restrictive means of preventing the transmission of Ebola by quarantining individuals when other forms of medical monitoring would have been sufficient;

(f)    failing to provide adequate resources, including food, to those whom Defendants quarantined; and

(g)    rejecting advice from the Centers for Disease Control concerning the medical necessity of quarantines for asymptomatic individuals.

176.    Defendant Malloy has not publicly withdrawn or rescinded his declaration of

Public Health Emergency dated October 7, 2014.

177.    As a result, Defendant Pino remains "authorized" to quarantine individuals when reasonable, individualized, and scientifically sound proof does not indicate that quarantine is necessary, and without proper notice, without providing essential supplies, and without prior or immediate post-quarantine judicial review initiated by the state.

## CLASS ACTION ALLEGATIONS

178.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the Named Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Bishop Yalartai, Esther Yalartai, Dr. O, and LCAC seek to represent a certified Plaintiff class consisting of all persons who will or intend to travel from Ebola-affected countries to Connecticut and are at risk of Defendants subjecting them to an unlawful and scientifically unjustified quarantine, pursuant to Defendants' policy, practice, and custom, as set forth in paragraphs 4141 and 1755.

179.    This action meets all the Rule 23(a) prerequisites for maintaining a class action.

180.    The class members are sufficiently numerous as to render joinder impracticable, satisfying Rule (23)(a)(1). Defendants' quarantine policies and practice exposes dozens of individuals each year to imminent risk of an unlawful and scientifically unjustifiable quarantine. In addition, joinder is impracticable because some members of the class are without means to retain an attorney to represent them in a civil rights lawsuit. Moreover, the class action is the only appropriate procedural avenue for the protection of the class members' constitutional rights.

181.    This action presents common questions of law and fact, resolution of which will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2). Such common questions of law and fact include, but are not limited to:

(a)      whether Defendants Malloy and Pino threaten to engage in a policy, practice and/or custom of quarantining individuals without warrant or probable cause and in the absence of reasonable, individualized, and scientifically sound proof required by the Fourth Amendment of the Constitution;

(b)      whether Defendants Malloy and Pino could engage in a less restrictive means than quarantining individuals when reasonable, individualized, and scientifically sound proof does not indicate that a quarantine is necessary, as required by the Fourteenth Amendment of the Constitution;

(c)      whether Defendants Malloy and Pino threaten to engage in a policy, practice and/or custom of quarantining individuals without individually assessing those subject to quarantine, without providing adequate and timely notification to those individuals of their rights, without ensuring state-initiated judicial review before or immediately after imposition of quarantine, and without other procedural protections required by the Fourteenth Amendment of the Constitution;

(d)      whether Defendants Malloy and Pino threaten to engage in a policy, practice and/or custom of depriving individuals of their fundamental rights, including freedom of association, freedom from restraint, and freedom to travel by quarantining individuals in the absence of reasonable, individualized, and scientifically sound proof required by the Fourteenth Amendment of the Constitution;

(e)      and whether Defendants Malloy and Pino threaten to engage in a policy, practice and/or custom of quarantining individuals that subjected them to discrimination on the basis of perceived disability in contravention of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

182.    The Named Plaintiffs' claims are typical of the putative class, satisfying Rule 23(a)(3). Like the other members of the class, the Defendants' policy, practice and/or custom of quarantining individuals without medical necessity and in violation of due process under the Fourteenth Amendment to the U.S. Constitution and Article I, Sections 8 and 10 of the Connecticut Constitution, the right to be free of unreasonable seizure under the Fourth Amendment to the U.S. Constitution and Article I, Sections 7 and 9 of the Connecticut Constitution, and disability discrimination statutes threatens to harm the Named Plaintiffs upon their return to Connecticut from present or future travel.

183.    The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys, satisfying Rule 23(a)(4). The Named Plaintiffs' interests do not conflict with other members of the class. Instead, the Named Plaintiffs' interests are the same as those of the class: not to be subject to an unlawful and scientifically unjustified quarantine upon return to Connecticut from Ebola-affected countries during present or future travel.

184.    The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the Named Plaintiffs are typical of those suffered by the class members.

185.    With respect to Rule 23(a)(4) adequacy, the Named Plaintiffs' attorneys, the Jerome N. Frank Legal Services Organization, are qualified, experienced, and able to conduct the litigation. The attorneys have the necessary knowledge, experience, and resources to litigate this matter. In addition, attorneys have expended the time and effort necessary to identify the class.

186.    Counsel for Plaintiffs do not anticipate any conflicts of interest between the Named Plaintiffs and the other class members, nor does Counsel for Plaintiffs anticipate any reason that the other class members would dispute the adequacy of the Jerome N. Frank Legal

37

Services Organization's representation.

187.    This action also meets all the requirements of, and is brought in accordance with, Rule 23(b)(2). Defendants' quarantine policies and practice pose a real and immediate threat generally applicable to each member of the class, thus making final declaratory and injunctive relief with respect to each class as a whole appropriate.

## CLAIMS FOR RELIEF

188.     Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko bring Claims 1-8 against Defendant Mullen, in her personal capacity, for declaratory relief and damages.

189.     Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai, Bishop Yalartai, Dr. O, and LCAC, on behalf of themselves and others similarly situated, bring Claims 1-4 against Defendants Malloy and Pino, in their official capacities, for declaratory and injunctive relief.

190.     At all times relevant to the allegations in this complaint, Defendants Malloy, Mullen, and Pino acted and threaten to act under color of state law.

FIRST CLAIM FOR RELIEF

(VIOLATION OF SUBSTANTIVE DUE PROCESS)

191.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

192.     Defendant Mullen infringed the fundamental rights of Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, and Boyko including freedom of association, freedom from restraint, and freedom to travel by ordering and carrying out detention and quarantines.

193.     Defendants Malloy and Pino threaten to infringe the fundamental rights of Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai, Bishop Yalartai, Dr. O, LCAC, and others similarly situated including freedom of association, freedom from restraint, and freedom to travel by ordering and carrying out detention and quarantines.

194.     Defendant Mullen also recklessly infringed the fundamental right to primary and secondary education of B.D., S.N., and Victor Sieh, under the Constitution of the State of Connecticut by ordering and carrying out detention and quarantines.

195.     Defendant Mullen, as authorized by Defendant Malloy, unreasonably, unlawfully, and recklessly deprived Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, and Boyko of their fundamental rights by detaining and quarantining them without medical or epidemiological justification and in a manner that substantially exceeded the least restrictive means necessary.

196.     Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko suffered injury and damages as a result of Defendant Mullen's conduct, including reckless and egregious conduct, in ordering and carrying out Plaintiffs' detention and quarantine.

197.     Defendants Malloy and Pino, based upon their policy and practice, threaten to unreasonably and unlawfully deprive Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai, Bishop Yalartai, Dr. O, LCAC, and others similarly situated, of their fundamental rights by detaining and quarantining them without medical or epidemiological justification.

198.     Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai, Bishop Harmon Yalartai, Dr. O, LCAC, and others similarly situated will likely suffer future injury and damages as a result of Defendants Malloy and Pino's threatened conduct to order and carry out future detention and quarantines.

199.     By the foregoing, Defendants Malloy, Mullen, and Pino have violated and threaten further to violate 42 U.S.C. § 1983, the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, Article I, Sections 8 and 10 of the Constitution of the State

of Connecticut, *Binette v. Sabo*, 710 A.2d 688 (Conn. 1998), and Conn. Gen. Stat. § 4-165.

SECOND CLAIM FOR RELIEF

(VIOLATION OF PROCEDURAL DUE PROCESS)

200.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

201.    Defendant Mullen violated the right to procedural due process of Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko under the Fourteenth Amendment to the Constitution of the United States by, in the course of issuing and enforcing quarantine, failing to (i) make an individualized assessment about their risk to the public health; (ii) provide timely notice of quarantine; (iii) provide timely notice to Plaintiffs of their right to challenge Orders for quarantine; and (iv) initiate a hearing within forty-eight hours for judicial review of Plaintiffs' quarantine where Plaintiffs could be represented by counsel, could present opposing evidence and argument, and could cross examine witnesses.

202.    Defendants Malloy and Pino, based upon their policy and practice, threaten to violate the procedural due process rights of Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalaratai, Bishop Harmon Yalaratai, Dr. O, LCAC, and others similarly situated during future detentions or quarantines.

203.    Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko suffered injury and damages as a result of the conduct, including reckless and egregious conduct, of Defendant Mullen in ordering and carrying out Plaintiffs' detention and quarantine.

204.    Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai, Bishop Yalartai, Dr. O, LCAC, and others similarly situated will likely suffer future injury and damages as a result of the threatened conduct of Defendants Malloy and Pino to

order and carry out Plaintiffs' future detention and quarantine.

205.     By the foregoing, Defendants have violated and threaten further to violate 42 U.S.C. § 1983, the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, Article I, Sections 8 and 10 of the Constitution of the State of Connecticut, *Binette v. Sabo*, 710 A.2d 688 (Conn. 1998), and Conn. Gen. Stat. § 4-165.

THIRD CLAIM FOR RELIEF

(VIOLATION OF THE RIGHT TO BE FREE OF UNREASONABLE SEIZURE)

206.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

207.     Defendant Mullen unreasonably and recklessly caused Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko to be confined under quarantine without warrant or probable cause in violation of Plaintiffs' right to be free of an unreasonable seizure under the Fourth Amendment of the Constitution of United States and Article I, Sections 7 and 9 the Constitution of the State of Connecticut.

208.     Defendants Malloy and Pino, based upon their policy and practice, threaten to cause Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalaratai, Bishop Yalaratai, Dr. O, LCAC, and others similarly situated to be confined under quarantine without warrant or probable cause in violation of Plaintiffs' right to be free of an unreasonable seizure under the Fourth Amendment of the Constitution of United States.

209.     Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko suffered injury and damages as a result of conduct, including reckless and egregious conduct, of Defendant Mullen in ordering and carrying out Plaintiffs' detention and quarantine.

210.     Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip,

Esther Yalartai, Bishop Yalartai, Dr. O, LCAC, and others similarly situated will likely suffer future injury and damages as a result of the threatened conduct of Defendants Malloy and Pino to order and carry out Plaintiffs' future detention and quarantine.

211.    By the foregoing, Defendants have violated and threaten further to violate 42 U.S.C. § 1983, Fourth Amendment of the U.S. Constitution, and Article I, Sections 7 and 9 the Constitution of the State of Connecticut, *Binette v. Sabo*, 710 A.2d 688 (Conn. 1998), and Conn. Gen. Stat. § 4-165.

FOURTH CLAIM FOR RELIEF

(VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITY ACT AND SECTION 504 OF THE REHABILITATION ACT OF 1973)

212.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

213.    Defendants unlawfully discriminated and threaten to discriminate against Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, and Boyko by reason of Plaintiffs' disability or perceived disability by ordering and maintaining their quarantine in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (2012) ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (2012) ("Rehabilitation Act").

214.    Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko meet the statutory definition of "qualified individual[s] with a disability" under the ADA and Rehabilitation Act, as Defendant Mullen regarded Plaintiffs as having Ebola, a physical impairment that substantially limits major life activities. 42 U.S.C. § 12102(1)(C) (2012).

215.    Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai and Bishop Yalartai, LCAC, and others similarly situated, meet the statutory

definition of "qualified individual[s] with a disability" under the ADA and Rehabilitation Act, as Defendants Malloy and Pino, based upon their policy and practice, threaten to regard Plaintiffs as having Ebola, a physical impairment that substantially limits major life activities. 42 U.S.C. § 12102(1)(C) (2012).

216.    Defendants are subject to Title II of the ADA because both the State of Connecticut and the Connecticut Department of Public Health meet the statutory definition of "public entity."  42 U.S.C. § 12131 (2012).

217.    Defendants are subject to Section 504 of the Rehabilitation Act due to the State of Connecticut's receipt of federal funds to carry out emergency preparedness programs. In fiscal year 2014, Connecticut received $7,767,333 from the Centers for Disease Control as part of the Public Health Emergency Preparedness Cooperative Agreement Funding initiative. Defendants received an additional $2,352,390 from the CDC as a supplement for Ebola Preparedness.

218.    Defendant Mullen discriminated against Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, and Boyko by ordering and maintaining Plaintiffs' quarantines—enforcing their unjustified isolation—without scientific justification, by reason of Plaintiffs' perceived disabilities. These actions violated Plaintiffs' right to be free of discrimination that would diminish their everyday life activities, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment, under Title II of the ADA and Section 504 of the Rehabilitation Act.

219.    These actions also violated the right of B.D., S.N., and Victor Sieh to be free of discrimination in their access to state- and federally-funded education under Title II of the ADA and Section 504 of the Rehabilitation Act.

220.    Defendants Malloy and Pino, based upon their policy and practice, threaten to

discriminate against Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai Bishop Yalartai, Dr. O, LCAC, and others similarly situated by ordering and maintaining Plaintiffs' quarantines without scientific justification, by reason of Plaintiffs' perceived disabilities. These threatened actions violate Plaintiffs' right to be free of discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act.

221.   Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko suffered injury and damages as a result of Defendants Mullen's conduct in ordering and carrying out Plaintiffs' quarantines.

222.   Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Esther Yalartai, Bishop Yalartai, Dr. O, LCAC, and others similarly situated will likely suffer future injury and damages as a result of Defendants Malloy and Pino's threatened conduct to order and carry out Plaintiffs' future quarantines.

FIFTH CLAIM FOR RELIEF

(FALSE IMPRISONMENT)

223.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

224.   Defendant Mullen unlawfully detained and confined Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko by recklessly authorizing, directing, approving, and implementing their detention and quarantine without Plaintiffs' consent or other privilege and without legal authority or justification.

225.   Defendant Mullen unlawfully detained and confined Plaintiff Nimley-Phillips by recklessly directing, approving, and implementing an order requiring Nimley-Phillips to be present to take temperatures for the Mensah-Sieh family three times a day, and to receive a

phone call at the house every morning for the duration of the quarantine.

226.    Defendant Mullen recklessly authorized and directed words or conduct that caused Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Nimley-Phillips, and Boyko a reasonable apprehension of force.

227.    Plainitffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Nimley-Phillips, and Boyko suffered injury or damages, including emotional distress, as a result of Defendant Mullen's reckless conduct in ordering and carrying out Plaintiffs' detention and quarantine.

## SIXTH CLAIM FOR RELIEF

### (INTENTIONAL INFLICTION OF EMOTIONAL DISRESS)

228.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

229.    Defendant Mullen intentionally and knowingly inflicted emotional distress upon Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko by ordering and carrying out Plaintiffs' detention and quarantine.

230.    Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko suffered injury and damages as a result of Defendant Mullen's reckless conduct in ordering and carrying out Plaintiffs' detention and quarantine.

## SEVENTH CLAIM FOR RELIEF

### (NEGLIENT INFLICTION OF EMOTIONAL DISTRESS)

231.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

232.    Defendant Mullen recklessly and negligently inflicted emotional distress and

caused resultant loss of income upon Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko in ordering and carrying out Plaintiffs' detention and quarantine.

233.   Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko suffered injury and damages as a result of Defendant Mullen's reckless conduct in ordering and carrying out Plaintiffs' detention and quarantine.

EIGHTH CLAIM FOR RELIEF

(NEGLIGENCE)

234.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

235.   Defendant Mullen negligently caused Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, and Boyko emotional and psychological injury in ordering and carrying out Plaintiffs' detention and quarantine.

236.   Defendant Mullen negligently caused Plaintiff Nimley-Phillips to incur out-of-pocket expenses in carrying out the quarantine of the Mensah-Sieh family in her home.

237.   Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Nimely-Phillips, and Boyko suffered injury or damages as a result of Defendant Mullen's reckless conduct in ordering and carrying out Plaintiffs' detention and quarantine.

**JURY DEMAND**

Plaintiffs waive their right, pursuant to Rule 38 of the Federal Rules of Civil Procedure, to trial by jury in this action.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs and other members of the proposed class respectfully request that this Court enter a final judgment:

47

(1)      Declaring, under 28 U.S.C. § 2201, that Connecticut's current quarantine policies and practices are unlawful in contravention of the Fourth and Fourteenth Amendments of the U.S. Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;

(2)      Declaring, under 28 U.S.C. § 2201, that the 2014 quarantine orders of Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, and Boyko, and the procedures through which those quarantines were carried out, were unlawful in contravention of the Fourth and Fourteenth Amendments of the U.S. Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;

(3)      Permanently enjoining and restraining Defendants Governor Dannel Malloy and Dr. Raul Pino from maintaining and implementing their quarantine policies and practices against present and future travelers to Connecticut, in contravention of the rights of Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Skrip, Bishop Yalartai, Esther Yalartai, Dr. O, LCAC, and members of the proposed class, under the Fourth and Fourteenth Amendments of the U.S. Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973;

(4)      Ordering Defendant Dr. Jewel Mullen, in her personal capacity, to pay damages to Plaintiffs Mensah-Sieh, B.D., S.N., Nathaniel Sieh, Victor Sieh, Kamara, Nimley-Phillips, and Boyko for harms suffered or costs incurred as a result of their ordered detention and quarantine;

(5)      Ordering Defendants to pay reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 (b) and 29 U.S. Code § 794a. (b); and

(6)      Granting such other and further relief as the Court deems just and proper.

BY: /s/ Michael J. Wishnie

Alexandra Brodsky, Law Student Intern
Elizabeth Deutsch, Law Student Intern
Kyle Edwards, Law Student Intern
Kyle Fees, Law Student Intern
Mekela Panditharatne, Law Student Intern
Emma Roth, Law Student Intern
Amy Kapczynski[*]
Michael J. Wishnie, No. ct27221
JEROME N. FRANK LEGAL SERVICES
ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

*Counsel for Plaintiffs*

---

[*] Application for admission to the U.S. District Court for the District of Connecticut pending.