**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

LIBERIAN COMMUNITY ASSOCIATION :
OF CONNECTICUT, et al.            :
  Plaintiffs,                   :
                           :
v.                                :      CIVIL NO: 3:16-cv-00201(AVC)
                           :
GOVERNOR DANNEL MALLOY, et al.,:
  Defendants.                  :


<u>**RULING ON THE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**</u>

This is a proposed class action seeking damages and injunctive relief in connection with the allegedly unlawful quarantine of individuals returning to Connecticut after traveling to Ebola-affected countries in West Africa.

It is brought pursuant to Title II of the Americans with Disabilities Act ("ADA"),[1] Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"),[2] 42 U.S.C. § 1983,[3] Article One

---

[1] 42 U.S.C. § 12132 (2012), *et seq.*

[2] 29 U.S.C. § 794 (2012), *et seq.*

[3] 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

of the Connecticut Constitution,[4] Conn. Gen. Stat. § 4-165,[5] and common law tenets concerning negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and false imprisonment.

The plaintiffs now move for class certification pursuant to Fed. R. Civ. P. 23.  The issues presented are: 1) whether the four prerequisites for class certification in Fed. R. Civ. P. 23(a) have been satisfied; and 2) if so, whether at least one of the additional criteria required by Fed. R. Civ. P. 23(b) is also present.

For the reasons that follow, the court concludes that: 1) the plaintiffs have not met their burden of establishing that all four prerequisites for class certification have been satisfied, particularly the numerosity requirement; and, 2) as a

---

[4] Article One § 7 of the Connecticut Constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ." Section 8 provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law."  Section 9 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." Section 10 provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[5] Conn. Gen. Stat. §4-165 provides in relevant part: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter."

result, the plaintiffs cannot establish that one of the

additional requirements of Rule 23(b) has been met.

Accordingly, the plaintiffs' motion for class certification

is DENIED.

### FACTS

Examination of the complaint, briefs on the issue of

class certification, and the accompanying exhibits, discloses

the following facts:

On March 23, 2014, the World Health Organization ("WHO")

announced an outbreak of Ebola[6] in West Africa.  Affected areas

included Guinea, Liberia, and Sierra Leone.  Within those three

countries, there were over 28,000 cases of Ebola during the

course of the epidemic.  Though large numbers of volunteers

traveled to the area, the Centers for Disease Control and

Prevention ("CDE") determined that there were fewer than 40

cases outside of those countries during the crisis.

Ebola is "spread through direct physical contact with the

bodily fluids of a symptomatic person, the body of a person who

has died from Ebola, or objects contaminated with the virus,

---

[6] An "ebola virus" is "any of several single-stranded RNA viruses of the
family *Filoviridae* (especially *Zaire Ebola Virus*) of African origin that
cause an often fatal hemorrhagic fever." *Ebola Virus Definition*, Merriam-
Webster.com, US National Library of Medicine, http://www.merriam-
webster.com/medlineplus/ebola+virus (last visited July 7, 2016).

such as used needles."  Symptoms of Ebola include "fever, headache, joint and muscle aches, diarrhea, and vomiting."  The incubation period is usually four to nine days, but can range from two to twenty-two days.

On August 22, 2014, the CDC publicly released guidance for monitoring individuals potentially exposed to Ebola.  For asymptomatic individuals returning from West Africa with "no risk" or "low risk" of exposure, the CDC recommended self-monitoring or active monitoring for twenty-one days and recommended no movement restrictions or quarantine.  For those with "high risk" of exposure, the CDC recommended "controlled movement" for twenty-one days so long as they were asymptomatic.  Those individuals were to inform public health officials of their intended travel and avoid long-distance public transportation.

On October 7, 2014, the co-defendant, Governor Dannel Malloy, issued an order declaring a public health emergency for the State of Connecticut.  This declaration authorized the co-defendant, Jewel Mullen, the Connecticut Commissioner of Public

Health, to direct the isolation[7] or quarantine[8] of individuals whom she "reasonably believe[d] to have been exposed to, infected with, or otherwise at risk of passing the Ebola virus."

On October 8, 2014, the CDC announced a safety plan, in collaboration with the Department of Homeland Security ("DHS"), to protect the United States from an Ebola outbreak. The plan provided that DHS would direct persons entering the United States from Guinea, Liberia, and Sierra Leone to one of five ports of entry, where the DHS could undertake specialized screenings.  These screenings would consist of trained officials observing travelers for signs of illness, asking health and exposure questions, and taking their temperatures.  If officers determined that passengers required further evaluation or monitoring, the officers would refer those travelers to the appropriate state or local public health authority. Those travelers with no symptoms, fever, or a known history of exposure were given information for self-monitoring and were approved to exit the airport.

---

[7] "Isolation separates sick people with a contagious disease from people who are not sick."  *Quarantine and Isolation*, Centers for Disease Control and Prevention, http://www.cdc.gov/quarantine (last visited July 7, 2016).

[8] "Quarantine separates and restricts the movement of people who were exposed to a contagious disease to see if they become sick."  *Quarantine and Isolation*, Centers for Disease Control and Prevention, http://www.cdc.gov/quarantine (last visited July 7, 2016).

On October 16, 2014, Malloy and Mullen established a statewide Ebola response plan, which the Governor's office described as "more stringent than the guidelines thus far issued by the Federal Center for Disease Control and Prevention." Under Malloy's plan, all asymptomatic individuals who had traveled to affected areas or been in contact with an infected individual were to be quarantined at home for twenty-one days. According to the complaint, Malloy and Mullen "knew that their policy and practice of quarantine was retrograde and ill-suited to contemporary public health challenges."

On October 27, 2014, the defendants established a new policy for Ebola response (the "revised plan"), which imposed "mandatory active monitoring" for asymptomatic travelers arriving in Connecticut from Guinea, Liberia, and Sierra Leone. This plan still contemplated "quarantine for individuals based on risk factors."[9]  It also required local health department staff or DPH epidemiologists to interview travelers and then decide whether to take steps beyond active mandatory monitoring.[10]

---

[9] Revised recommendations from the CDC also released that same day did not recommend quarantine for any asymptomatic individuals and recommended "no restrictions on travel, work, public conveyances, or congregate gatherings" for those individuals.

[10] This revised plan took effect after the Mensah-Sieh family, Boyko, and

On November 7, 2015, December 29, 2015, and January 14,
2016, the WHO declared Sierra Leone, Guinea, and Liberia Ebola-
free, respectively.  However, according to the WHO, Sierra
Leone, Guinea, and Liberia "remain at high risk of additional
small outbreaks of Ebola." In January 2016, Dr. Bruce Aylward,
WHO's Special Representative for the Ebola Response, reported
that "[t]he risk of re-introduction of infection is diminishing
as the virus gradually clears from the survivor population, but
we still anticipate more flare-ups and must be prepared for
them."

In an address to the WHO's Executive Board, Dr. Margaret
Chan, Director-General of the WHO, announced, "While the job is
by no means finished, no one anticipates that the situation will
return to what we were seeing 15 months ago."

On April 1, 2016, Dannel Malloy terminated the state of
emergency in Connecticut,

> [g]iven that the Centers for Disease Control and
> Prevention (CDC) and the Department of Homeland
> Security (DHS) have ended all active Ebola-related
> surveillance in the United States; and [g]iven further
> that, on March 29, 2016, the Director General of the
> World Health Organization (WHO) terminated the Public
> Health Emergency of International Concern (PHEIC)

---

Skrip were first placed in quarantine. According to the complaint, "[o]n
information and belief, Defendants failed to reconsider Plaintiffs'
quarantine orders under the [revised plan], and required Plaintiffs to remain
in quarantine for an additional three to twelve days."

regarding the Ebola virus disease outbreak in West
Africa, in accordance with International Health
Regulations (IHR) (2005), and also terminated the
Temporary Recommendations that she had issued in
relation to this event . . . .

**Plaintiffs Boyko and Skrip**

In September 2014, Ryan Boyko and Laura Skrip, Ph.D.
students at Yale University, traveled to Liberia to assist the
Liberian Ministry of Health and Social Welfare with data
analysis of the 2014 outbreak.  While in Liberia, they did not
volunteer in a healthcare capacity and did not treat patients.
They did not have contact with any Ebola-symptomatic
individuals.

On October 3, 2014, Boyko developed a minor cough.  On
advice of the Yale Health Center, Boyko decided to delay his
return to the United States.  Skrip decided to remain as well.

On October 6, 2014, Boyko tested negative for Ebola and
received a handwritten letter confirming the results from a
United States colonel supervising the lab.

Before leaving, the students learned that a cameraman who
had spent time at their hotel had developed symptoms of Ebola.
Local CDC agents "assured Boyko and Skrip that this was a 'no
risk' interaction as the cameraman had not become contagious
until after the last time they saw him."

8

On October 11, 2014, they arrived at John F. Kennedy International Airport.  Upon arrival, Boyko and Skrip were screened by the CDC and ruled medically fit.  The U.S. Department of Homeland Security allowed both of them to enter the United States.  Officials then alerted Mullen of the return of Boyko and Skrip pursuant to the CDC guidelines regarding referral to local public health departments.

After returning to New Haven that day, the students monitored themselves for symptoms.  On the morning of October 15, 2016, Boyko's temperature rose to 100.1 degrees Fahrenheit.  Boyko informed the staff at the Yale Health Center, who decided to transport him to the hospital.

On October 16, 2016, Boyko tested negative for Ebola.  Nonetheless, Mullen delivered an isolation order for Boyko, authorized by Malloy's Ebola response plan. The order required Boyko to remain in hospital isolation for twenty-one days. The following day the CDC confirmed the negative test result.  Mullen then issued a quarantine order backdated to October 10, requiring that Boyko be confined in his home for twenty-one days, or up to and including October 30. The order did not inform Boyko of his rights or his ability to challenge the quarantine, but it did state that he would be subject to

sanctions if he violated it.

That same day Mullen also issued a quarantine order for Skrip, which was also backdated to October 10.  The defendants informed Skrip of the quarantine via telephone and did not provide her information about her ability to challenge the quarantine. Skrip did not receive a written order until October 22, 2014.

The New Haven Police Department stationed a police officer outside the apartments of both Boyko and Skrip twenty-four hours per day. The defendants "failed to direct officials to supply the homes of Boyko and Skrip with sufficient food and other essential supplies for the duration of their quarantines." However, Yale furnished Boyko and Skrip with Visa gift cards to order deliveries of supplies.

Despite implementation of the revised plan on October 27, 2016, Mullen did not review the quarantine orders against Boyko and Skrip.  On October 30, 2014, the defendants released Boyko and Skrip from quarantine.

According to the complaint, Skrip plans on returning to Liberia "under the reasonable fear of being subjected to another unjustified and unlawful quarantine."

**Mensah-Sieh Family**

Louis Mensah-Sieh, her husband, Nathaniel Sieh, and their four children Emmanuel Kamara, Victor Sieh, B.D., and S.N., lived in Liberia until October 2014.  In June 2013, DHS awarded the Mensah-Sieh family visas to the United States. In preparation for their departure, the Mensah-Sieh family underwent a series of health tests, completed paperwork, and paid the associated fees.  In the fall of 2014, the DHS approved the Mensah-Family to leave Liberia for the United States.

On October 18, 2014, they arrived at John F. Kennedy International Airport. Upon their arrival, DHS officials questioned the family and took their health-related documentation.  DHS did not mention any information related to quarantine and did not instruct the Mensah-Sieh family to monitor their symptoms.  DHS notified local public health officials of the family's arrival.

Assunta Nimley-Phillips,[11] Louis's sister, picked up the Mensah-Sieh family from the airport and drove them to her home. On October 20, 2014, Maureen Lillis, West Haven's Director of Public Health, called Nimley-Phillips to inform her of the

---

[11] Nimley-Phillips moved from Liberia to Connecticut in the 1980s.

quarantine of the Mensah-Sieh family.  Lillis told the family
that they were not allowed to leave the house for twenty-one
days. Lillis instructed Nimley-Phillips to monitor their
symptoms and temperatures. The defendants provided no supplies
and no written quarantine order.  They did not inform the family
of their rights or their ability to challenge the order.

The West Haven Police Department stationed officers outside
the home twenty-four hours per day.  Only Nimley-Phillips and
her daughter were permitted to enter or leave the home. "Each
time [they] entered or exited their home, the police officers
stationed outside . . . would question them about where they
were going and check their identification."  During the twenty-
one day quarantine, all six members of the Mensah-Sieh family
stayed in a single room in Nimley-Phillips' basement.

Despite implementation of the revised plan on October 27,
2016, Mullen did not review the quarantine orders against the
Mensah-Sieh family.  On November 10, 2014, the defendants
released the family from quarantine.

According to the complaint, the Mensah-Sieh family plans to
return to Liberia to visit friends and family in the future, but
"[t]hey remain concerned that they may be subjected to future
quarantines upon their return to Connecticut.

**Mary Jean O, M.D.**

From December 2014 to February 2015, Mary Jean O, M.D., a licensed emergency medicine physician at Robert Wood Johnson University Hospital, worked at multiple Ebola Holding Units in Sierra Leone. Upon her return, she underwent enhanced entry screening and completed twenty-one days of active monitoring. She was not, however, quarantined.

According to the complaint, Dr. O plans to return to West Africa in the future and "reasonably fears that Defendants' may subject her to unlawful and scientifically unjustified quarantine policies and practices upon her return to Connecticut."

**Bishop and Esther Yalartai**

Bishop and Esther Yalartai traveled to Liberia "to attend the Annual Convention of the Faith Revival Temple Churches, to conduct humanitarian work with Liberian schools, and to visit family members."  They intend to travel to Liberia once or twice annually to oversee the work of the Faith Revival Temple Churches.  According to the complaint, they "reasonably fear that they may be subject to Defendants' quarantine policies and practices, which are unlawful and scientifically unjustified, upon their return to Connecticut."

**Liberian Community Association of Connecticut ("LCAC")**

The Liberian Community Association of Connecticut ("LCAC") is a non-profit organization headquartered in Hartford, Connecticut with over 230 members. LCAC "contributes to development efforts in Liberia" and "works to establish and maintain strong connections between the Liberian community in Connecticut and communities in Liberia."

Many members have current and future plans to travel between Connecticut and Liberia.  According to the complaint, "[t]here is a real and immediate threat" that the defendants will quarantine the plaintiffs in the future "because the risk of a future Ebola outbreak in West Africa is high, because Defendants reserve the authority to issue scientifically unjustified and unlawful quarantine orders . . . , and because it is highly likely that Defendants will again overreact to a future Ebola outbreak."

## STANDARD

To certify a class, the district court must determine through "rigorous analysis" that the plaintiffs have met each of the requirements of Fed. R. Civ. P. 23, and in doing so, may make factual and legal inquiries as necessary.  See Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982); In re Initial Public

Offerings Securities Litig., 471 F.3d 24, 41 (2d Cir. 2006).
"[A] district judge is to assess all of the relevant evidence
admitted at the class certification stage and determine whether
each Rule 23 requirement has been met, just as the judge would
resolve a dispute about any other threshold prerequisite for
continuing a lawsuit." Id. at 42.

Rule 23(a) states four prerequisites for class
certification: one or more members of a class may sue on behalf
of all class members if: (1) the class is so numerous that
joinder of all members is impracticable; (2) there are questions
of law or fact common to the class; (3) the claims or defenses
of the representative parties are typical of the claims or
defenses of the class; and (4) the representative parties will
fairly and adequately protect the interests of the class.  Fed.
R. Civ. P. 23(a).

Once a plaintiff has satisfied the four prerequisites of
Rule 23(a), a plaintiff must then satisfy one of three
requirements under Rule 23(b) as well.  Fed. R. Civ. P. 23(b).
See In re Am. Int'l Grp., Inc. Sec. Litig., 689 F.3d 229, 238
(2d Cir. 2012).

**DISCUSSION**

The plaintiffs propose a class consisting of "all individuals who will travel or intend to travel from Liberia, Sierra Leone, and Guinea ("Ebola-affected countries") to Connecticut and are at risk of Defendants Malloy and Pino subjecting them to an unlawful and scientifically unjustified quarantine, pursuant to Defendants' quarantine policies and practice."

The defendants argue that the court should not certify the proposed class because the plaintiffs have not met their burden of proving the requirements of Fed. R. Civ. P. 23(a), nor have they established that the class is maintainable under Fed. R. Civ. P. 23(b).[12]

## I.   Rule 23(a) Prerequisites

### A. Numerosity

The plaintiffs argue that the proposed class satisfies the numerosity requirement because "the class of individuals currently traveling or who intend to travel from West Africa to Connecticut is significantly greater than forty."  The

---

[12] The defendants also contend that class certification is unwarranted because the claims of the named plaintiffs are moot and the plaintiffs lack Article III standing. However, because the court concludes that the plaintiffs have failed to satisfy the 23(a) prerequisite of numerosity, the court declines to rule on the issues of mootness or standing at this time.

defendants respond that the plaintiffs "have not met, and cannot
meet, their burden to establish numerosity."  Specifically, they
argue that, "although as many as 70 people may decide to travel
between Connecticut and West Africa, Plaintiffs have not
established – and cannot establish – that any of those people
are at sufficient risk of being quarantined to support the
exercise of federal jurisdiction." The plaintiffs reply that
they "have established that Ebola outbreaks remain a serious and
ongoing threat, and the risk of future unlawful quarantines
rises far above the level of pure speculation."

"The numerosity requirement . . . does not mandate that
joinder of all parties be impossible——only that the difficulty
or inconvenience of joining all members of the class make use of
the class action appropriate."  <u>Cent. States Se. & Sw. Areas
Health & Welfare Fund v. Merck-Medco Managed Care, LLC</u>, 504 F.3d
229, 244-45 (2d Cir. 2007). A party seeking class certification
"must be prepared to prove that there are *in fact* sufficiently
numerous parties." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338,
350 (2011).

Courts weigh the following factors when assessing the
numerosity requirement: "(i) judicial economy, (ii) geographic
dispersion, (iii) the financial resources of the class members,

(iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." Pennsylvania Pub. Sch. Employees' Ret. Sys. V. Morgan Stanley & Co., 772 F.3d 111, 120 (2d Cir. 2011).[13]

The court concludes that the proposed class is too speculative to satisfy the numerosity requirement for class certification.  Assuming there are significant numbers of Connecticut residents who will travel to Liberia, Sierra Leone, and Guinea, there is simply insufficient factual support for the proposition that those individuals would be "at risk of Defendants Malloy and Pino subjecting them to an unlawful scientifically unjustified quarantine, pursuant to Defendants' quarantine policies and practice."

---

[13] With respect to these factors, the plaintiffs contend that: (i) the class action procedure will "preserve judicial resources" by obviating the need for the court "to consider each class member's claim independently every time they travel to Connecticut[;]" (ii) "the class is geographically dispersed across both the state of Connecticut and . . . the world[;]" (iii) joinder is impracticable due to "the financial resources of the class members, who include recent immigrants, graduate students, and clergy[;]" (iv) "class members would be unable to bring suit separately because they generally lack legal sophistication . . . , and their injunctive claims do not have financial significance that would incentivize securing representation[;]" and (v) "the request for injunctive relief for the class will involve future class members."   The defendants respond that the plaintiffs "offer no evidence as to geographic dispersion of the putative class . . .  [as] all class members must be Connecticut residents . . . and Connecticut is a relatively small state geographically[;]" the availability of a hearing procedure pursuant to Conn. Gen. Stat. § 19a-131b "alleviates Plaintiffs' purported concerns about financial issues and class members' ability to bring separate suits[;]" and "the existence of any 'future class members' is simply too speculative to support either jurisdiction or certification."

First, the plaintiffs contend that there is a "high risk" of another Ebola outbreak in West Africa, but the attached exhibits – supplied by the plaintiffs – do not support such a generalized assertion. Specifically, the WHO reported that there is a "high risk of additional *small* outbreaks of Ebola" (emphasis added).  Dr. Bruce Aylward, WHO's Special Representative for the Ebola Response, explained that "[t]he risk of re-introduction of infection is diminishing."  While the WHO anticipates more flare-ups, Dr. Maragret Chan, Director General of the WHO, explicitly guaranteed that "all will be quickly contained." She further assured the WHO Executive Board that "no one anticipates that the situation will return to what we were seeing 15 months ago" – when the crisis began. She stated that "[t]he steps taken at national and international levels have had a decisive impact" and that "no one will let this virus take off and run away again."

In October 2014, when Malloy declared a state of emergency in Connecticut, he did so "[i]n response to the epidemic of the Ebola virus [at the time] affecting multiple countries in western Africa."  The evidence – again supplied by the plaintiffs – does not indicate that such an epidemic is likely to recur.  In fact, the statements made by WHO representatives

suggest that such a recurrence is highly unlikely due to the extraordinary efforts of medical and governmental entities across the world.

Second, the policies and procedures implemented by the defendants were specific to the Ebola crisis as it existed at the time that they were adopted. Indeed, those procedures evolved as the risk of the Ebola outbreak changed. After the initial quarantine of the Mensah-Sieh family, Boyko, and Skrip, the defendants developed a revised response plan that required "DPH to conduct individualized risk assessment . . . *before* deciding whether to take steps beyond active mandatory monitoring" (emphasis added).

Dr. Mary Jean O, a named plaintiff, returned to Connecticut after this revised plan went into effect.  She underwent enhanced entry screening upon her return from Liberia in accordance with the new procedures. Though she had been physically working in a healthcare capacity at Ebola Holding Units in "two of the hardest hit communities," Dr. O was not quarantined when she arrived in Connecticut.  This suggests that, even if there were another Ebola outbreak of the same magnitude *and* the Governor (whoever he may be) again decided to declare a state of emergency, travelers would not necessarily be

at risk of a scientifically unjustified quarantine.

The court concludes that the evidence of numerosity is too speculative to merit certification.  Thus, the plaintiffs have not met their burden of establishing that the proposed class "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). Because the court concludes that the proposed class is too speculative to be sufficiently numerous, it is not necessary for the court to continue its analysis of the remaining class certification requirements.

<u>**CONCLUSION**</u>

For the reasons stated above, the plaintiffs' motion for class certification (document no. 9) is DENIED.

It is so ordered, this 29th day of July 2016, at Hartford, Connecticut.

_____/s/_____<br>
Alfred V. Covello<br>
United States District Judge