# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LIBERIAN COMMUNITY ASSOCIATION : | |
| OF CONNECTICUT, ET AL., : | |
|   plaintiffs, : | |
| : | |
| v. : | CIVIL NO: 3:16-cv-00201(AVC) |
| : | |
| GOVERNOR DANNEL MALLOY, ET AL.,: | |
|   defendants. : | |

## <u>RULING ON THE DEFENDANTS' MOTION TO DISMISS</u>

This is an action seeking damages and injunctive relief in connection with the allegedly unlawful quarantine of individuals returning to Connecticut after traveling to Ebola-affected countries in West Africa.

It is brought pursuant to Title II of the Americans with Disabilities Act ("ADA"),[1] Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"),[2] 42 U.S.C. § 1983,[3] Article One

---

[1] 42 U.S.C. § 12132 (2012), <u>et seq</u>.

[2] 29 U.S.C. § 794 (2012), <u>et seq</u>.

[3] 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

of the Connecticut Constitution,[4] Conn. Gen. Stat. § 4-165,[5] and common law tenets concerning negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and false imprisonment.

The defendants now move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The issues presented are: 1) whether the plaintiffs have standing to assert causes of action seeking prospective injunctive relief; and 2) whether the defendant, Dr. Mullen, is entitled to qualified immunity from the plaintiffs' causes of action seeking damages.

For the reasons that follow, the court concludes that: 1) the plaintiffs lack standing to allege causes of action seeking prospective relief; 2) Dr. Mullen is entitled to qualified immunity; and 3) the court will not exercise supplemental

---

[4] Article One § 7 of the Connecticut Constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ." Section 8 provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law." Section 9 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." Section 10 provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[5] Conn. Gen. Stat. § 4-165 provides in relevant part: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter."

jurisdiction over the plaintiffs' state law causes of action.

Accordingly, the defendants' motion to dismiss the plaintiffs' complaint (doc. no. 38) is GRANTED.

## FACTS

Examination of the complaint and the accompanying exhibits, discloses the following facts:

On March 23, 2014, the World Health Organization ("WHO") announced an outbreak of Ebola[6] in West Africa.  Affected areas included Guinea, Liberia, and Sierra Leone.  Within those three countries, there were over 28,000 cases of Ebola and more than 11,000 deaths during the course of the epidemic.  Though large numbers of volunteers traveled to the area, the Centers for Disease Control and Prevention ("CDC") determined that there were fewer than 40 cases outside of those countries during the crisis.

Ebola is "spread through direct physical contact with the bodily fluids of a symptomatic person, the body of a person who has died from Ebola, or objects contaminated with the virus, such as used needles."  Symptoms of Ebola include "fever, headache, joint and muscle aches, diarrhea, and vomiting."  The

---

[6] An "ebola virus" is "any of several single-stranded RNA viruses of the family *Filoviridae* (especially *Zaire Ebola Virus*) of African origin that cause an often fatal hemorrhagic fever." *Ebola Virus Definition*, Merriam-Webster.com, US National Library of Medicine, http://www.merriam-webster.com/medlineplus/ebola+virus (last visited March 15, 2017).

incubation period is usually four to nine days, but can range from two to twenty-one days.

On August 22, 2014, the CDC publicly released guidance for monitoring individuals potentially exposed to Ebola. For asymptomatic individuals returning from West Africa with "no risk" or "low risk" of exposure, the CDC recommended self-monitoring or active monitoring for twenty-one days and recommended no movement restrictions or quarantine. For those with "high risk" of exposure, the CDC recommended "controlled movement" for twenty-one days so long as they were asymptomatic. Those individuals were to inform public health officials of their intended travel and avoid long-distance public transportation.

On October 7, 2014, the co-defendant, Governor Dannel Malloy, issued an order declaring a public health emergency for the State of Connecticut. This declaration authorized the co-defendant, Dr. Jewel Mullen, the Connecticut Commissioner of Public Health, to direct the isolation[7] or quarantine[8] of

---

[7] "Isolation separates sick people with a contagious disease from people who are not sick." *Quarantine and Isolation*, Centers for Disease Control and Prevention, http://www.cdc.gov/quarantine (last visited March 15, 2017).

[8] "Quarantine separates and restricts the movement of people who were exposed to a contagious disease to see if they become sick." *Quarantine and Isolation*, Centers for Disease Control and Prevention, http://www.cdc.gov /quarantine (last visited March 15, 2017).

individuals whom she "reasonably believe[d] to have been exposed to, infected with, or otherwise at risk of passing the Ebola virus."

On October 8, 2014, the CDC announced a safety plan, in collaboration with the Department of Homeland Security ("DHS"), to protect the United States from an Ebola outbreak.  The plan provided that DHS would direct persons entering the United States from Guinea, Liberia, and Sierra Leone to one of five ports of entry, where the DHS could undertake specialized screenings.  These screenings would consist of trained officials observing travelers for signs of illness, asking health and exposure questions, and taking their temperatures.  If officers determined that passengers required further evaluation or monitoring, the officers would refer those travelers to the appropriate state or local public health authority.  Those travelers with no symptoms, fever, or a known history of exposure were given information for self-monitoring and were approved to exit the airport.

On October 16, 2014, Malloy and Dr. Mullen established a statewide Ebola response plan, which the Governor's office described as "more stringent than the guidelines thus far issued by the Federal Center for Disease Control and Prevention."

Under Malloy's plan, all asymptomatic individuals who had traveled to affected areas or been in contact with an infected individual were to be quarantined at home for twenty-one days. According to the complaint, Malloy and Dr. Mullen "knew that their policy and practice of quarantine was retrograde and ill-suited to contemporary public health challenges."

On October 27, 2014, the defendants established a new policy for Ebola response (the "revised plan"), which imposed "mandatory active monitoring" for asymptomatic travelers arriving in Connecticut from Guinea, Liberia, and Sierra Leone. This plan still contemplated "quarantine for individuals based on risk factors."[9]  It also required local health department staff or DPH epidemiologists to interview travelers and then decide whether to take steps beyond active mandatory monitoring.[10]

On November 7, 2015, December 29, 2015, and January 14, 2016, the WHO declared Sierra Leone, Guinea, and Liberia Ebola-

---

[9] Revised recommendations from the CDC also released that same day did not recommend quarantine for any asymptomatic individuals and recommended "no restrictions on travel, work, public conveyances, or congregate gatherings" for those individuals.

[10] This revised plan took effect after the plaintiffs, the Mensah-Sieh family, Boyko, and Skrip, were first placed in quarantine.  According to the complaint, "[o]n information and belief, Defendants failed to reconsider Plaintiffs' quarantine orders under the [revised plan], and required Plaintiffs to remain in quarantine for an additional three to twelve days."

free, respectively.  However, according to the WHO, Sierra

Leone, Guinea, and Liberia "remain at high risk of additional

small outbreaks of Ebola."  In January 2016, Dr. Bruce Aylward,

WHO's Special Representative for the Ebola Response, reported

that "[t]he risk of re-introduction of infection is diminishing

as the virus gradually clears from the survivor population, but

we still anticipate more flare-ups and must be prepared for

them."

In an address to the WHO's Executive Board, Dr. Margaret

Chan, Director-General of the WHO, announced, "[w]hile the job

is by no means finished, no one anticipates that the situation

will return to what we were seeing 15 months ago."

On April 1, 2016, Dannel Malloy terminated the state of

emergency in Connecticut,

> [g]iven that the Centers for Disease Control and
> Prevention (CDC) and the Department of Homeland
> Security (DHS) have ended all active Ebola-related
> surveillance in the United States; and [g]iven further
> that, on March 29, 2016, the Director General of the
> World Health Organization (WHO) terminated the Public
> Health Emergency of International Concern (PHEIC)
> regarding the Ebola virus disease outbreak in West
> Africa, in accordance with International Health
> Regulations (IHR) (2005), and also terminated the
> Temporary Recommendations that she had issued in
> relation to this event . . . .

**Plaintiffs Boyko and Skrip**

In September 2014, the plaintiffs, Ryan Boyko and Laura

Skrip, Ph.D. students at Yale University, traveled to Liberia to assist the Liberian Ministry of Health and Social Welfare with data analysis of the Ebola outbreak.  While in Liberia, they did not volunteer in a healthcare capacity and did not treat patients.  They did not have contact with any Ebola-symptomatic individuals.

On October 3, 2014, Boyko developed a minor cough.  On advice of the Yale Health Center, Boyko decided to delay his return to the United States.  Skrip decided to remain as well.

On October 6, 2014, Boyko tested negative for Ebola and received a handwritten letter confirming the results from a United States colonel supervising the lab.

Before leaving, the students learned that a cameraman who had spent time at their hotel had developed symptoms of Ebola.  Local CDC agents "assured Boyko and Skrip that this was a 'no risk' interaction as the cameraman had not become contagious until after the last time they saw him."

On October 11, 2014, they arrived at John F. Kennedy International Airport.  Upon arrival, Boyko and Skrip were screened by the CDC and ruled medically fit.  The U.S. Department of Homeland Security allowed both of them to enter the United States.  Officials then alerted Dr. Mullen of the

return of Boyko and Skrip pursuant to the CDC guidelines regarding referral to local public health departments.

After returning to New Haven that day, the students monitored themselves for symptoms.  On October 15, 2016, Boyko's temperature rose to 100.1 degrees Fahrenheit.  Boyko informed the staff at the Yale Health Center, who decided to transport him to the hospital.

On October 16, 2016, Boyko tested negative for Ebola. Nonetheless, Dr. Mullen delivered an isolation order for Boyko, authorized by Malloy's Ebola response plan.  The order required Boyko to remain in hospital isolation for twenty-one days.  On October 17, 2016, the CDC confirmed the negative test result. Dr. Mullen then issued a quarantine order backdated to October 10, requiring that Boyko be confined in his home for twenty-one days, or up to and including October 30.  The order did not inform Boyko of his rights or his ability to challenge the quarantine, but it did state that he would be subject to sanctions if he violated it.

That same day, Dr. Mullen also issued a quarantine order for Skrip, which was also backdated to October 10.  The defendants informed Skrip of the quarantine via telephone and did not provide her information about her ability to challenge

the quarantine.  On October 22, 2014, Skrip received a written
quarantine order.

The New Haven Police Department stationed a police officer
outside the apartments of both Boyko and Skrip twenty-four hours
per day.  The defendants "failed to direct officials to supply
the homes of Boyko and Skrip with sufficient food and other
essential supplies for the duration of their quarantines."
However, Yale furnished Boyko and Skrip with Visa gift cards to
order deliveries of supplies.

Despite implementation of the revised plan, Dr. Mullen did
not review the quarantine orders against Boyko and Skrip.  On
October 30, 2014, the defendants released Boyko and Skrip from
quarantine.

According to the complaint, Skrip plans on returning to
Liberia, but is "under the reasonable fear of being subjected to
another unjustified and unlawful quarantine."

**Mensah-Sieh Family**

The plaintiffs, Louise Mensah-Sieh, her husband, Nathaniel
Sieh, and their four children Emmanuel Kamara, Victor Sieh,
B.D., and S.N., were Liberian natives.  In June 2013, DHS
awarded the Mensah-Sieh family visas to the United States.  In
preparation for their departure, the Mensah-Sieh family

underwent a series of health tests, completed paperwork, and paid the associated fees.  In the fall of 2014, the DHS approved the Mensah-Sieh family to leave Liberia for the United States.

On October 18, 2014, the family arrived at John F. Kennedy International Airport.  Upon their arrival, DHS officials questioned the family and took their health-related documentation.  DHS did not mention any information related to quarantine and did not instruct the Mensah-Sieh family to monitor their symptoms.  DHS notified local public health officials of the family's arrival.

Assunta Nimley-Phillips,[11] Louise's sister, picked up the Mensah-Sieh family from the airport and drove them to her home. On October 20, 2014, Maureen Lillis, West Haven's Director of Public Health, called Nimley-Phillips to inform her of the quarantine of the Mensah-Sieh family.  Lillis told the family that they were not allowed to leave the house for twenty-one days.  Lillis instructed Nimley-Phillips to monitor their symptoms and temperatures.  The defendants provided no supplies and no written quarantine order.  They did not inform the family of their rights or their ability to challenge the order.

---

[11] Nimley-Phillips moved from Liberia to Connecticut in the 1980s.

The West Haven Police Department stationed officers outside the home twenty-four hours per day.  Only Nimley-Phillips and her daughter were permitted to enter or leave the home.  "Each time [they] entered or exited their home, the police officers stationed outside . . . would question them about where they were going and check their identification."  During the twenty-one day quarantine, all six members of the Mensah-Sieh family stayed in a single room in Nimley-Phillips' basement.

Despite implementation of the revised Ebola response plan, Dr. Mullen did not review the quarantine orders against the Mensah-Sieh family.  On November 10, 2014, the defendants released the family from quarantine.

According to the complaint, the Mensah-Sieh family plans to return to Liberia to visit friends and family in the future, but "[t]hey remain concerned that they may be subjected to future quarantines upon their return to Connecticut."

**Mary Jean O, M.D.**

From December 2014 to February 2015, the plaintiff, Mary Jean O, M.D., a licensed emergency medicine physician at Robert Wood Johnson University Hospital, worked at multiple Ebola Holding Units in Sierra Leone. Upon her return, she underwent enhanced entry screening and completed twenty-one days of active

monitoring. She was not, however, quarantined.

According to the complaint, Dr. O plans to return to West
Africa in the future and "reasonably fears that Defendants' may
subject her to unlawful and scientifically unjustified
quarantine policies and practices upon her return to
Connecticut."

**Bishop and Esther Yalartai**

The plaintiffs, Bishop and Esther Yalartai, traveled to
Liberia "to attend the Annual Convention of the Faith Revival
Temple Churches, to conduct humanitarian work with Liberian
schools, and to visit family members." They intend to travel to
Liberia once or twice annually to oversee the work of the Faith
Revival Temple Churches. According to the complaint, they
"reasonably fear that they may be subject to Defendants'
quarantine policies and practices, which are unlawful and
scientifically unjustified, upon their return to Connecticut."

**Liberian Community Association of Connecticut ("LCAC")**

The plaintiff, Liberian Community Association of
Connecticut ("LCAC"), is a non-profit organization headquartered
in Hartford, Connecticut with over 230 members. LCAC
"contributes to development efforts in Liberia" and "works to
establish and maintain strong connections between the Liberian

community in Connecticut and communities in Liberia."

Many members have current and future plans to travel between Connecticut and Liberia. According to the complaint, "[t]here is a real and immediate threat" that the defendants will quarantine the plaintiffs in the future "because the risk of a future Ebola outbreak in West Africa is high, because Defendants reserve the authority to issue scientifically unjustified and unlawful quarantine orders . . . , and because it is highly likely that Defendants will again overreact to a future Ebola outbreak."

**STANDARD**

A court must grant a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1) where a plaintiff has failed to establish subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is proper "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); see Moodie v. Federal Reserve Bank of

<u>N.Y.</u>, 58 F.3d 879, 882 (2d Cir. 1995) (recognizing that "[d]efects in subject matter jurisdiction cannot be waived and may be raised at any time during the proceedings."). Once subject matter jurisdiction is challenged, "a plaintiff . . . has the burden of proving by a preponderance of the evidence that it exists." <u>Makarova</u>, 201 F.3d at 113. In analyzing a motion to dismiss pursuant to Rule 12(b)(1), the court must accept all well-pleaded factual allegations as true and must draw inferences in favor of the plaintiff. <u>Merritt v. Shuttle, Inc.</u>, 245 F.3d 182, 186 (2d Cir. 2001). Where a defendant challenges the district court's subject matter jurisdiction, the court may resolve disputed factual issues by reference to evidence outside the pleadings, such as affidavits. <u>Makarova</u>, 201 F.3d at 113.

The court must grant a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if a plaintiff fails to establish a claim upon which relief may be granted. A motion to dismiss "assess[es] the legal feasibility of the complaint, [but it does] not . . . assay the weight of the evidence which might be offered in support thereof." <u>Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.</u>, 748 F.2d 774, 779 (2d Cir. 1984). When ruling on a motion to

dismiss, the court must accept that the well-pleaded facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. See Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

The issue at this juncture is not whether the plaintiff will prevail, but whether she should have the opportunity to prove her claim. See Conley v. Gibson, 355 U.S. 41, 45 (1957). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Gibbons v. Malone, 703 F.3d 595, 599 (2d Cir. 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 555 (stating that a complaint must provide more than "a formulaic recitation of the elements of a cause of action"). In its review of a 12(b)(6) motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which

judicial notice may be taken."  <u>Samuels v. Air Transp. Local</u>
<u>504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

**DISCUSSION**

### I.   Federal Causes of Action - Prospective Relief

The defendants argue that "the speculative nature of a
future West African Ebola outbreak alone precludes Plaintiffs'
from establishing standing."  Specifically, they argue that
"even if such an outbreak occurred it would require yet more
speculation to hypothesize that Plaintiffs would be in West
Africa during the outbreak or choose to travel there."

The plaintiffs respond that they have standing because they
"have alleged a substantial risk that a future Ebola outbreak
will occur, in response to which Defendants will impose the
illegal quarantine policies and practices which they have
previously applied to Plaintiffs, which Defendants have never
disavowed, and which Defendants here defend."  Specifically,
they aver that "leading experts in global public health have
attested to the significant likelihood of a future outbreak."

Article III of the United States Constitution provides that
federal courts only have jurisdiction over cases and
controversies.  U.S. Const. art. III, § 2.  Thus, "standing is a
prerequisite for a party to invoke federal subject matter

jurisdiction." Norflet v. John Hancock Financial Services, Inc., 422 F. Supp. 2d 346, 351 (D. Conn. 2006) (citing Fulani v. Bentsen, 35 F.3d 49, 51 (2d Cir. 1994)). "To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Mhany Management, Inc. v. County of Nassau, 819 F.3d 581, 600 (2d Cir. 2016) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000))(internal quotation marks omitted). "A federal court may have subject matter jurisdiction over a claim for damages yet lack jurisdiction over a claim for prospective equitable relief arising out of the same injury." Williams v. City of New York, 34 F. Supp. 3d 292, 295 (S.D.N.Y. 2014).

"In order to meet the constitutional minimum of standing to seek injunctive relief, [plaintiffs] must carry the burden of establishing that [they have] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." Shain v. Ellison, 356 F.3d 211,

215 (2d Cir. 2004) (quoting <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-02 (1983))(internal quotation marks omitted).  The plaintiffs "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [they] . . . will be injured in the future."  <u>Shain</u>, 356 F.3d at 215 (citation omitted)(internal quotation marks omitted)(omission in original).  Further, "abstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."  <u>Id.</u> (citations omitted)(quotation marks omitted)(alteration omitted).

In this case, the court concludes that the plaintiffs lack standing to allege causes of action seeking prospective injunctive relief.  The court reaches this conclusion, after construing the complaint as true and drawing all inferences in favor of the plaintiffs, because the complaint does not allege an "injury or threat of injury" that is "real and immediate."  <u>Shain</u>, 356 F.3d at 215.

Put simply, at the time of the filing of the complaint, there was not a "real and immediate" threat of injury to the plaintiffs.  Instead, the complaint asserts an injury that is abstract and based on conjecture.  Specifically, the plaintiffs' assert that <u>if</u> they were in Liberia and <u>if</u> the Ebola virus makes

19

a resurgence and _if_ they attempted to return to Connecticut and _if_ they were subjected to an unlawful quarantine, they would be injured.[12]  See _Shain_, 356 F.3d at 216 ("Such an accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief.").  The plaintiffs' assertion of injury does not "show a _likelihood_ that [they] . . . will be injured in the future."  _Id._ at 215 (quoting _City of Los Angeles v. Lyons_, 461 U.S. 95, 101-02 (1983))(internal quotation marks omitted)(emphasis added).

The plaintiffs' proffered evidence regarding the end of the Ebola epidemic and the defendants' revised Ebola response policy demonstrates that the alleged injury is conjectural.  In October 2014, the defendants established a revised Ebola response policy that implemented mandatory active monitoring for asymptomatic travelers arriving in Connecticut.  In February 2015, one of the plaintiffs, Dr. Mary Jean O, returned to Connecticut from Liberia, after having provided healthcare services to individuals in some of the locations most severely impacted by Ebola.  Dr. O was screened pursuant to the defendants' new

---

[12] The court notes that three of the plaintiffs satisfy this first inference because they were in Liberia at the time of the filing of the complaint. However, these three plaintiffs cannot show that there is a likelihood that the other inferences could be satisfied.

policy and was not placed in quarantine.  Dr. O's return lends
strong support to the conclusion that the plaintiffs' causes of
action seeking prospective injunctive relief allege an "abstract
injury" and are speculative.  If Dr. O was not placed in
quarantine after her return from performing medical services in
areas severely impacted by Ebola, it is not likely that the
other plaintiffs would be.

The plaintiffs note that Ebola has recently flared up in
certain areas of West Africa.  The complaint, however, does not
indicate that an Ebola outbreak of the size of the previous
epidemic, and warranting a similar response, is likely.  On the
contrary, the complaint only indicates the potential for small
flare ups of a localized nature.  Indeed, on January 14, 2016,
the World Health Organization ("WHO") declared Liberia Ebola-
free.  While Dr. Aylward of the WHO noted that additional flare-
ups of Ebola were anticipated, he also noted that the virus was
gradually clearing from the survivor population and that the
risk of re-introduction was diminishing.  Dr. Maragret Chan,
Director General of the WHO, specifically stated that "no one
anticipates that the situation will return to what we were
seeing" when the crisis started.

Accordingly, the plaintiffs' lack standing to assert causes

21

of action seeking prospective relief; thus, counts one through four must be dismissed.[13]

## II.  Federal Causes of Action – Damages / Qualified Immunity

The complaint seeks damages from Dr. Mullen, in her individual capacity, for allegedly violating the plaintiffs' substantive due process rights, procedural due process rights, and Fourth Amendment rights.  The defendants argue that Dr. Mullen is immune from the plaintiffs' causes of action seeking damages.  Specifically, the defendants assert that the "Supreme Court has never squarely addressed the question of what due process and the Fourth Amendment require an official to do (or refrain from doing) when she is forced to decide whether to quarantine individuals who may have been exposed to Ebola, or another deadly infectious disease, and may be capable of inadvertently infecting others."  The defendants also contend that "federal law grants officials imposing quarantine orders absolute immunity from individual capacity damages claims against them."  They further aver that "[e]ven if it were not established that Dr. Mullen is entitled to absolute immunity, it

---

[13] The court will assume <u>arguendo</u> for the purposes of this motion that the Liberian Community Association of Connecticut ("LCAC") has organizational standing. However, LCAC's causes of action seeking prospective relief must be dismissed for the reasons previously discussed.

is clear that qualified immunity would bar Plaintiffs' damages claims against her."

The plaintiffs respond that Dr. Mullen should not be provided immunity.  Specifically, they assert that because she was acting in an administrative function she "is . . . most similarly situated to the many senior officials for whom the Supreme Court has rejected absolute immunity."  The plaintiffs further contend that their "quarantines were clearly unconstitutional" and "Dr. Mullen could not have reasonably believed that her actions were lawful."

"The doctrine of qualified immunity protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively reasonable."  Turner v. Boyle, 116 F. Supp. 3d 58, 91 (D. Conn. 2015) (quoting Tenenbaum v. Williams, 193 F.3d 581, 595-96 (2d Cir. 1999))(internal quotation marks omitted). To determine whether an individual is entitled to qualified immunity, the court must "engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (quoting

Pearson v. Callahan, 555 U.S. 223, 232 (2009)). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know about the constitutionality of the conduct." Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted).

"Until recently, courts were required to perform the two-part qualified inquiry in order, first asking whether the defendant violated a constitutional right and, if it was determined that a right was violated, only then asking whether that right was clearly established." Doninger, 642 F.3d at 345. "Following the Supreme Court's decision in Pearson v. Callahan, however, [courts] may now exercise . . . discretion in deciding the order in which to conduct the qualified immunity analysis." Id. (citation omitted).

The Supreme Court has stated that "[w]hile this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citations omitted)(internal quotation marks omitted)(alteration omitted). Further, "the clearly established law must be particularized to

the facts of the case." Id. at 552 (citation omitted)(internal quotation marks omitted). The second circuit has noted, however, that "[e]ven where the law is clearly established and the scope of an official's permissible conduct is clearly defined, the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful." Taravella v. Town of Wolcott, 599 F.3d 129, 134 (2d Cir. 2010) (citation omitted)(internal quotation marks omitted).

In assessing a qualified immunity defense, the court must "accept as true all well-pled factual allegations, and draw all reasonable inferences in the plaintiff's favor." Warney v. Monroe Cnty., 587 F.3d 113, 116 (2d Cir. 2009). At the motion to dismiss stage, "the defense faces a formidable hurdle." McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004).

The court concludes that Dr. Mullen is entitled to qualified immunity because she did not violate clearly established law. Alternatively, even if Dr. Mullen's actions violated clearly established law, her actions were objectively reasonable.

**A. Quarantine Case Law**

The court could not find, nor did the parties cite, any

case law regarding an individual's substantive and procedural due process rights in a quarantine scenario that would render Dr. Mullen's actions a violation of clearly established law in a particularized setting.[14]  However, several quarantine cases are relevant.

In Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 (1905), the Supreme Court held that a Massachusetts law requiring vaccination for smallpox did not violate the United States Constitution.  The Court stated that "it has distinctly recognized the authority of a state to enact quarantine laws and health laws of every description."  Jacobson, 197 U.S. at 25. The Court, in dicta, also noted that:

> An American citizen arriving at an American port on a vessel in which, during the voyage, there had been cases of yellow fever or Asiatic cholera, he, although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will on board of such vessel or in a quarantine station, until it be ascertained by inspection, conducted with due diligence, that the

---

[14] The court notes that there is one case originating from the New Jersey district court that deals with a factually similar scenario. See Hickox v. Christie, 2016 WL 4744181, at *6-18 (D. N.J. 2016) (granting qualified immunity to the defendants regarding the plaintiff's federal causes of action arising from her quarantine after returning from an Ebola affected country because the defendants did not violate clearly established quarantine, civil commitment, or Fourth Amendment law). However, the district court's decision was rendered after the underlying events in this case so it could not have clearly established the law at the time of the events. Nor can a district court in New Jersey clearly establish the law in the second circuit. See Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." (citation omitted)).

> danger of the spread of the disease among the community at
> large has disappeared.

Jacobson, 197 U.S. at 29.  The Court, however, did state that

courts will strike down a "statute purporting to have been

enacted to protect the public health" if it "has no real or

substantial relation to those objects, or is, beyond all

question, a plain, palpable invasion of rights."  Id. at 31.

In U.S. ex rel. Siegel v. Shinnick, 219 F. Supp. 789, 790-

91 (E.D.N.Y. 1963), the court upheld the isolation of a woman

who had arrived in the United States from an area infected with

small pox and who did not have the requisite vaccinations.  The

court stated that "[w]hile isolation is not to be substituted

for surveillance unless the health authority considers the risk

of transmission of the infection by the suspect to be

exceptionally serious, the judgment required is that of a public

health officer and not of a lawyer."  Id. at 791.  The court

noted that public health officers "deal in a terrible context

and the consequences of mistaken indulgence can be irretrievably

tragic.  To supercede [sic] their judgment there must be a

reliable showing of error."  Shinnick, 219 F. Supp. at 791.

Regarding the public health officers' decision to isolate the

woman, the court stated that "[t]heir conclusion . . . cannot be

challenged on the ground that they had no evidence of the

exposure of [the woman] to the disease; they, simply, were not free and certainly not bound to ignore the facts that opportunity for exposure existed . . . [and] that no one on earth could know for fourteen days [the incubation period] whether or not there had been exposure." Shinnick, 219 F. Supp. at 791. Courts, however, have struck down quarantine orders "when they were found to be arbitrary and unreasonable in relation to their goal of protecting the public health." Hickox v. Christie, 2016 WL 4744181, at *8 (D. N.J. 2016). See id. at *9-10 (collecting and describing cases in which quarantine orders were struck down on the basis of being overbroad and arbitrary).

### i. Plaintiffs Boyko and Skrip

In this case, the court concludes that Dr. Mullen did not violate clearly established law regarding Boyko and Skrip's quarantine. Instead, the court concludes that Dr. Mullen's quarantine orders were similar to orders that courts have upheld.

Here, similar to in Shinnick, Dr. Mullen implemented quarantine orders that related to the incubation period of the infectious illness sought to be prevented. The complaint, which the court must accept as true, states that Ebola's "incubation

period (the time from infection to onset of symptoms) is usually four to nine days <u>but can range from two to twenty-one days</u>." (emphasis added).  Dr. Mullen ordered the plaintiffs quarantined for twenty-one days, the upper-limit of the incubation period. Dr. Mullen even backdated the quarantine order date to reflect the last time the plaintiffs could have potentially been exposed to Ebola.  While asymptomatic individuals cannot transmit Ebola, quarantining an individual during the incubation period is not arbitrary; it is substantially related to preventing any potential transmission of a highly infectious illness.[15]  For instance, an asymptomatic individual could potentially become symptomatic during the incubation period and then transmit the illness to others prior to being isolated.

Dr. Mullen's quarantine orders also conform to dicta in <u>Jacobson</u>, in which the Supreme Court stated that an individual "although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will . . .

_____

[15] Here, Boyko demonstrated symptoms of Ebola, specifically a fever; therefore, Dr. Mullen acted reasonably in ordering his quarantine. <u>See Shinnick</u>, 219 F. Supp. at 791 (stating that public health officials' quarantine decisions "cannot be challenged on the ground that they had no evidence of the exposure of [an individual] to the disease; they, simply, were not free and certainly not bound to ignore the facts that opportunity for exposure existed."); <u>Jacobson v. Commonwealth of Massachusetts</u>, 197 U.S. 11, 29 (1905) ("An American citizen . . . although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will . . . .").

until it be ascertained by inspection . . . that the danger of the spread of the disease among the community at large has disappeared." 197 U.S. at 29. Put simply, the plaintiffs have failed to show that Dr. Mullen's quarantine orders were contrary to any clearly established quarantine case law.

The plaintiffs assert that the defendants' policies were more stringent than the Center for Disease Control's guidelines and, therefore, they were not the least restrictive means available, violating the plaintiffs' rights to substantive due process.[16] In support of their argument, the plaintiffs' assert that "[i]n other prophylactic detention contexts, courts have routinely found the restraint justifiable only where the state's interest could not reasonably be achieved through less intrusive means." The plaintiffs' assertion, however, belies their proposition that qualified immunity is inapplicable. The plaintiffs' citation to "other prophylactic detention contexts" demonstrates that the law was not "clearly established," in the "particularized" set of facts of implementing a quarantine and

---

[16] To the extent the plaintiffs argue that Dr. Mullen violated the state statutory prescription regarding implementing a quarantine only if it is the least restrictive means available, this claim is not cognizable under § 1983. See Pollnow v. Glennon, 757 F.2d 496, 501 (2d Cir. 1985) ("[A] violation of state law is not cognizable under § 1983."(citation omitted)).

whether the law required the least restrictive means available.[17]
The question for the court, under clearly established quarantine
case law, is not whether the quarantine was the least
restrictive means available; but whether the state's policies
were "exercised in particular circumstances and in reference to
particular persons in such an arbitrary, unreasonable manner, or
might go so far beyond what was reasonably required for the
safety of the public, as to authorize or compel the courts to
interfere for the protection of such persons." <u>Jacobson</u>, 197
U.S. at 28.

    Alternatively, the court concludes that even if the
defendants violated clearly established law, qualified immunity
is still warranted because Dr. Mullen's actions were objectively
reasonable.  Dr. Mullen acted in an objectively reasonable
manner because one of the plaintiffs, Boyko, demonstrated signs
of Ebola infection.  Boyko registered a fever after returning
from an Ebola infected area.  Although Boyko's tests later
returned as negative for Ebola, a temporary quarantine limited
in duration to the incubation period of a virus responsible for
an epidemic that killed over 11,000 individuals, was not

---

[17] Nor do the plaintiffs cite to any case clearly establishing an individual's
right to procedural due process in a quarantine situation.

objectively unreasonable.  Dr. Mullen's quarantine of Skrip was also objectively reasonable because she had been traveling with Boyko.

### ii.  Mensah-Sieh Family

The court also concludes that Dr. Mullen's quarantine of the Mensah-Sieh family did not violate clearly established quarantine case law.  The family's immigration to Connecticut from an area facing a severe epidemic is similar to the isolation order in Shinnick, which the court upheld.  See Shinnick, 219 F. Supp. at 790-91.  While the Mensah-Sieh family denied any exposure to the Ebola virus, Dr. Mullen was not required to accept their assertions as true.  See id. at 791 (stating that public health officials' quarantine decisions "cannot be challenged on the ground that they had no evidence of the exposure of [an individual] to the disease; they, simply, were not free and certainly not bound to ignore the facts that opportunity for exposure existed.").  Dr. Mullen's order quarantining the Mensah-Sieh family was not imposed in an "arbitrary" and "unreasonable manner" and, therefore, it was proper.  Jacobson, 197 U.S. at 28.

Accordingly, Dr. Mullen's orders quarantining the plaintiffs did not violate quarantine case law.

**B. Civil Commitment Case Law**

The plaintiffs cite to civil commitment case law in support of their assertion that Dr. Mullen violated "clearly established law." The defendants respond that the "Plaintiffs cite no Supreme Court authority in the infectious disease context, and the only Second Circuit decision they cite is . . . a non-precedential summary order that cannot factor into the clearly established analysis."

In Best v. St. Vincents Hosp., No. 03 CV.0365 RMB JCF, 2003 WL 21518829 (S.D.N.Y. July 2, 2003), adopted sub nom. Best v. Bellevue Hosp. Center, No. 03 CV.0365 RMB JCF, 2003 WL 21767656 (S.D.N.Y. July 30, 2003), aff'd in part, vacated in part, 115 F. App'x 459 (2d Cir. 2004), the plaintiff, a tuberculosis patient, was involuntarily detained by the defendant hospitals. The plaintiff brought an action challenging his detention and alleged violations of his substantive and procedural due process rights. The court, in analyzing the substantive and procedural due process claims, applied civil commitment case law to his isolation.[18] Best, 2003 WL 21518829, at *5. In doing so, the court specifically stated that the "Supreme Court, in the civil

---

[18] The court also specifically noted that "Courts have consistently upheld the constitutionality of quarantine as a public health measure." Best, 2003 WL 21518829, at *6.

commitment cases, has set constitutional standards that must be met before an individual can be detained." Best, 2003 WL 21518829, at *6. The court also noted that the "central requirements set out by the [Supreme] Court are the right to a particularized assessment of an individual's danger to self or others and the right to less restrictive means." Id. The court concluded that the defendants did not violate the plaintiff's constitutional rights. The district court adopted the magistrate's report and recommendation. The second circuit, in a non-precedential summary order, affirmed the decision in part and vacated and remanded in part.

Here, the court concludes that case law in the civil commitment context is not sufficiently analogous to a quarantine set of facts to have clearly established that Dr. Mullen's actions violated the law. In reaching this conclusion, the court recognizes that the Supreme Court "explained decades ago, [that] the clearly established law must be particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citations omitted)(internal quotation marks

omitted)(alteration omitted).  If the court was to analogize a

quarantine set of facts to a civil commitment set of facts, it

would undermine the principle that for a right to be clearly

established the facts must be "particularized."  The court is

cognizant that "the standard must not be so specific that

qualified immunity could be overcome only if the very action in

question has previously been held unlawful."  <u>Nagle v. Marron</u>,

663 F.3d 100, 114 (2d Cir. 2011) (citation omitted)(internal

quotation marks omitted).  At the time of the alleged

misconduct, however, it would not have been apparent to a public

health official in implementing a quarantine order to consider

another body of case law, i.e. civil commitment law, before

imposing said order.

The plaintiffs cite <u>Best</u> in support of their assertion that

it is clear that civil commitment case law applies in the

quarantine context and that Dr. Mullen's actions violated their

substantive and procedural due process rights.  The plaintiffs'

reliance on <u>Best</u>, however, is misplaced.  Perhaps most

important, is that the second circuit affirmed in part and

vacated in part the district court's decision in a non-

precedential summary order.[19]  Therefore, the court's decision in

---

[19] <u>See</u> <u>Jackler v. Byrne</u>, 658 F.3d 225, 244 (2011) ("Under this Court's Rules,

Best cannot be deemed to have clearly established the law in a particularized set of facts because by rule the summary order is non-precedential.[20]

Accordingly, the court concludes that case law in the civil commitment context is not sufficiently related to the quarantine context in order to clearly establish the law such that qualified immunity is not applicable to Dr. Mullen.

**C. Fourth Amendment**

The defendants next argue that the "Plaintiffs have not cited-and Defendants have not located-any decisions clearly establishing the Fourth Amendment's requirements in the context of quarantines generally, let alone in the context of a disease like Ebola." Specifically, they aver that "[q]ualified immunity therefore bars Plaintiffs' Fourth Amendment claims."

The plaintiffs respond that the defendants violated their Fourth Amendment rights "because Defendants seized their persons without obtaining affirmative judicial approval and/or even

_____

and as stated in the heading of our summary orders deciding appeals, 'RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.' . . . <u>Fierro</u> [a summary order opinion] does not require the court to uphold the qualified immunity defenses asserted here for, by Rule, <u>Fierro</u> has no precedential effect.").

[20] <u>See</u> <u>Bell v. Luna</u>, 856 F. Supp. 2d 388, 401 n.3 (D. Conn. 2012) ("The Second Circuit has not decided whether an unpublished summary order can serve to 'clearly establish' the law for qualified immunity purposes. The Second Circuit did recently hold that a summary order that grants qualified immunity cannot bind future panels to grant qualified immunity in similar cases . . . ." (citations omitted)).

possessing probable cause to quarantine."

The Fourth Amendment of the United States Constitution

provides that:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable searches
> and seizures, shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be
> searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "[A] seizure deprives the individual of

dominion over his or her person or property."  Horton v.

California, 496 U.S. 128, 133 (1990).  "It is well established

that the Fourth Amendment applies to seizures made in the civil

context as well as the criminal context."  Milner v. Duncklee,

460 F. Supp. 2d 360, 367 (D. Conn. 2006).  "A seizure in the

civil context must also be reasonable, meaning that it must be

made only upon probable cause, that is, only if there are

reasonable grounds for believing that the person seized is

subject to seizure under the governing legal standard."  Id. at

369 (citation omitted)(internal quotation marks omitted).

According to Malloy's emergency declaration, Dr. Mullen was

explicitly authorized to "isolate or quarantine . . . any

individual or group of individuals whom the Commissioner

reasonably believes to have been exposed to, infected with, or

otherwise at risk of passing the Ebola virus."[21]

In this case, the court concludes that Dr. Mullen did not violate clearly established Fourth Amendment law. The plaintiffs were returning from a region that was suffering from a devastating Ebola crisis that resulted in the death of over 11,000 people. Dr. Mullen, pursuant to Governor Malloy's emergency declaration, had the authority to "isolate or quarantine" any person that she "reasonably believe[d]" had been "exposed to, infected with, or [was] otherwise at risk of passing the Ebola virus." Plaintiffs Boyko and Skrip's potential exposure to an individual that later developed symptoms similar to Ebola and Boyko's subsequent development of an unexplained fever, provided ample probable cause for their quarantine. The Mensah-Sieh family's immigration to the United States from a country in the throes of a deadly epidemic also provided probable cause for their quarantine. Although the Mensah-Sieh family asserted that they were not exposed to any individuals with Ebola, Dr. Mullen was not required to rely on

---

[21] The plaintiffs' complaint refers to Malloy's emergency declaration and, therefore, the court can consider it. See Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) ("There are exceptions to Rule 12(b)(6)'s general prohibition against considering materials outside the four corners of the complaint. For example, . . . the court may also rely upon documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." (citation omitted)(internal quotation marks omitted)(alteration in original)).

their assertions.  See U.S. ex rel. Siegel v. Shinnick, 219 F. Supp. 789, 790-91 (E.D.N.Y. 1963).  Dr. Mullen had probable cause to believe she could quarantine the plaintiffs pursuant to Governor Malloy's emergency declaration and her actions did not violate clearly established Fourth Amendment law.[22]

Dr. Mullen did not violate clearly established Fourth Amendment law nor did she violate clearly established quarantine law, and civil commitment law is not sufficiently particularized to apply in a quarantine scenario.  Therefore, Dr. Mullen is entitled to qualified immunity and counts one through three must be dismissed.[23]

---

[22] Alternatively, even if Dr. Mullen's actions violated clearly established law, it was objectively reasonable for her to believe that her actions were lawful under the circumstances.  A public health official quarantining individuals, returning from a region facing a deadly epidemic, for the incubation period of the illness sought to be prevented is entirely reasonable and in furtherance of their efforts to prevent the spread of the deadly illness.

[23] The court concludes that count four must also be dismissed.  Count four seeks individual capacity damages against Dr. Mullen for allegedly violating Title II of the Americans with Disability Act and section 504 of the Rehabilitation Act of 1973.  The second circuit has stated that "[i]nsofar as [the plaintiff] is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."  Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001). The plaintiffs concede that this individual capacity cause of action against Dr. Mullen must be dismissed.  The plaintiffs, in their opposition brief, seek leave to amend their complaint to substitute Governor Malloy in his official capacity regarding count four.  The court denies the plaintiffs' request because it is improper. See Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("[A] party is not entitled to amend his pleading though statements in his brief."); see also Koehler v. Metropolitan Transportation Authority, 2016 WL 6068810, at *5 (E.D.N.Y. 2016) ("Courts have held that a bare request to amend a pleading contained in a

## III. State Law Causes of Action

The defendants next argue that if this court dismisses the plaintiffs' federal causes of action, it should "decline to exercise supplemental jurisdiction over Plaintiffs' state claims."

The plaintiffs respond that they "do not dispute that, if no federal claims remain in this case, the Plaintiffs' state law claims must be dismissed for lack of pendant jurisdiction."

"The statutory concept of supplemental jurisdiction codified and expanded somewhat the earlier judge-made doctrines of pendent and ancillary jurisdiction.  Just as with the prior law of pendent jurisdiction, the exercise of supplemental jurisdiction is left to the discretion of the district court . . . ."  Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994). Pursuant to 28 U.S.C. § 1367(c)(3) "[t]he district court[] may decline to exercise supplemental jurisdiction over a claim under subsection (a) if: (3) the district court has dismissed all claims over which it has original jurisdiction."  "If the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should

---

brief, which does not also attach the proposed amended pleading, is improper under FED. R. CIV. P. 15." (citation omitted)(internal quotation marks omitted)).

be dismissed as well." <u>Purgess</u>, 33 F.3d at 138 (citation omitted)(internal quotation marks omitted)(alteration omitted).

In this case, the court declines to exercise supplemental jurisdiction over the plaintiffs' state law causes of action. The court declines to exercise supplemental jurisdiction having dismissed all of the plaintiffs' federal causes of action early in the litigation and absent objection from the plaintiffs. <u>See</u> <u>Marcus v. AT&T Corp.</u>, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state law claims should be dismissed as well."). Thus, the court concludes that counts five through eight must be dismissed.

## CONCLUSION

For the reasons stated above, the defendants' motion to dismiss the plaintiffs' complaint (doc. no. 38) is GRANTED.

It is so ordered, this 28th day of March 2017, at Hartford, Connecticut.

_____/s/_____

Alfred V. Covello,
United States District Judge